**UNITED STATES of America ex rel. Richard Louis ROMAN, Petitioner,**

v.

**James R. SCHLESINGER, Secretary of Defense, et al., Respondents.**

**No. 75 C 145, 75 C 1062.**

United States District Court,
E. D. New York.

Nov. 26, 1975.

Levy, Gutman, Goldberg & Kaplan, New York City, for petitioner by Abigail Pessen and Jeremiah S. Gutman, New York City.

David G. Trager, U. S. Atty., E.D.N.Y., Brooklyn, N. Y., for respondents by Pamela C. McGuire and Richard L. Huffman, Asst. U. S. Attys.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

Petitioner, a Navy sonar technician, is again before the court seeking a writ of habeas corpus, 28 U.S.C. § 2241, compelling the Navy to release him from further obligation under a two-year enlistment extension agreement he signed in 1971. He claims that the Navy failed to give him the agreed *quid pro quo* which induced his consent to the two-year extension, *i. e.*, an assignment to "computer school", and he is, therefore, being unlawfully held in the Navy. *Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972); *United States ex rel. Schonbrun v. Commanding Officer*, 403 F.2d 371, 373 (2 Cir. 1968), *cert. denied*, 394 U.S. 929, 89 S.Ct. 1195, 22 L. Ed.2d 460 (1969).

The parties were before the court earlier this year when petitioner sought the same relief he requests now. At that time, after holding an evidentiary hearing at which petitioner and several naval personnel testified concerning the substantive claims raised, the court treated petitioner's application as one seeking mandamus relief and deferred further consideration of the matter until petitioner exhausted his administrative remedies within the Navy. Memorandum of Decision, April 21, 1975.

Petitioner did pursue available remedies within the Navy and his request for cancellation of his contract was finally denied by the Chief of Naval Personnel on July 2, 1975. That same day, petitioner filed a "second" application for a writ of habeas corpus incorporating by reference the grounds alleged in his first application and further alleging exhaustion of administrative remedies.

The parties agree that if the merits of petitioner's claim are reached by the court, a decision should be rendered based on the evidence presented at the hearing on the first application. The respondents urge, however, that the court no longer has jurisdiction in this matter and consequently cannot reach the merits. For the reasons stated below, the court is of opinion that it does have jurisdiction but that on the merits petitioner is not entitled to the relief he seeks.

## I.

The government contends that the court's April 21, 1975 decision is, in effect, a dismissal of petitioner's first application and that no jurisdiction exists as to the "second" petition because both petitioner and his custodian are outside the court's jurisdiction. It is unnecessary to reach the question of whether there is an independent jurisdictional basis for the second petition because it was the court's intention to retain jurisdiction to decide the first petition on the merits, if petitioner's administrative remedies proved unsuccessful.[1] That intention was expressed as follows:

---

1. If the question of jurisdiction as to the "second" petition were reached, the court would conclude that jurisdiction exists. While neither petitioner nor his "custodian" were physically present in New York when the "second" petition was filed (his ship was then in Philadelphia, Pennsylvania), there is authority for the proposition that jurisdiction is proper in the district where the petitioner has the most significant contacts with the respondent. *Strait v. Laird*, 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972); *Sholars v. Matter*, 491 F.2d 279 (9 Cir. 1974); *Park v. Thompson*, 356 F.Supp. 783 (D.Hawaii 1973); *Baugh v. Bennett*, 350 F.Supp. 1248 (D.Idaho 1972).

Those contacts clearly exist in this case. Petitioner resided here before joining the

"The court has reviewed the factual and legal basis for each of these contentions and has concluded that the interests of all concerned would not be served by an *immediate ruling on the merits* of petitioner's asserted contract claims. For the reasons which follow, the court will deny habeas corpus relief *at this time*, treat the application as a mandamus proceeding under 28 U.S.C. § 1361, and direct respondents to permit petitioner to avail himself of all available intraservice remedies that may be appropriate."

And again:

"Should petitioner promptly avail himself of this remedy without obtaining the desired relief, this court would then have grounds for proceeding *directly* to the merits of his claims." Memorandum of Decision, April 21, 1975, at 9 and 13; emphasis supplied.

Having fully explored the substantive claims raised by petitioner in two days of hearings, there is no reason why the court should not proceed to a decision on the merits.

### II.

At the age of 18 and after having graduated high school, petitioner decided to enlist in the Navy. To that end, during December 1970, he approached a Navy recruiter in Coney Island, Brooklyn, New York, where he then lived, and expressed a desire to enlist for four years of active duty.[2] The recruiter suggested a six-year active duty enlistment but petitioner declined. He was given some forms to fill out and he returned to the recruiter two or three days later with the forms completed.

The recruiter then referred him to a second recruiter at a different location in Brooklyn (Bay Ridge), to whom he went several days later. The second recruiter also mentioned a six-year active duty enlistment and suggested that petitioner take a test to see if he would be eligible for a training program which would give him a year to a year and a half of schooling and working on the latest IBM equipment. The recruiter mentioned that the school was in California. No mention was made of where petitioner would be assigned after school. Petitioner agreed and took a five and a half hour test which was graded immediately thereafter.

Petitioner was informed that he had done well on the examination and was therefore eligible for whatever program he wanted. He requested "computer school", having had a previous interest in that field, and was under the impression when he left the recruiter that it was settled that he had enlisted for six years of active duty and would, in return for the extra two years of active duty, be sent to "computer school." No contracts were signed at that time.

On January 26, 1971, petitioner went to Fort Hamilton in Brooklyn, had his pre-induction physical and signed a prepared contract. Before signing the contract, petitioner began to read it and noticed that it provided for only a four-year active duty commitment instead of the six-year program which he understood he had agreed to. He pointed out the discrepancy to the Navy official at whose desk he was reading the contract. The Navy official then made a telephone call to an unidentified person, spoke to

Navy, enlisted and was processed here, filed his first petition while present here, retained attorneys here and the evidentiary hearing on the merits of the claims was held here without objection by respondent. There is absolutely no prejudice to the Navy in having the matter resolved in this court on an already established record.

2. Enlistment in the United States Navy obligates the enlistee to serve a total period of six years. This six-year commitment can be fulfilled in a variety of ways, including enlistment in the Regular Navy for six years, or enlistment in the Regular Navy for less than six years and satisfaction of the remaining obligation by service in the Naval Reserve or by an extension of the term of enlistment as part of a special training program.

that person for a while and then gave the phone to petitioner. The man on the other end of the line told petitioner that there had been a mistake but that he should sign the four-year contract so that he could be shipped out to boot camp that day and he, in turn, would send out an explanatory letter correcting the error. Petitioner then signed the contract and was shipped out to boot camp in Great Lakes, Illinois.

During boot camp, on February 23, 1971, he was sent to a building to be interviewed for job classification. He explained to the man interviewing him that there had been a mix-up, that he was supposed to be in for six years active duty and that there should be a letter explaining this. The interviewer looked through petitioner's records, told him he had found the letter, and stated that the error could be corrected by executing a two-year extension agreement. This agreement gave as the reason for the extension "Training (Advanced Electronics Field (AEF) Program)" Petitioner's Exh. 2, and further provided that "I understand this extension agreement becomes binding upon execution and thereafter may not be cancelled except as set forth in BUPERS Manual, Article 1050150." *Id.*

Petitioner informed the interviewer that he had been promised "computer school" but the interviewer insisted that petitioner fill out a sheet listing five school choices in order of preference. Petitioner acquiesced and listed "computer school" as his first choice and sonar school as his fourth choice.

Three days before completing boot camp, he was informed that he was to be sent to sonar school in Key West, Florida, after taking a basic electricity and electronics course at Great Lakes. He complained to his commanding officer that he was supposed to go to "computer school", not sonar school, and was told to take up the problem with the next command, the basic electricity and electronics school. However, when he complained there he was told to wait until he arrived at sonar school because the basic electricity and electronics course was a prerequisite for both sonar and "computer school."

He spent two to three months at the basic electricity and electronics school, completing the course on June 18, 1971, and was then sent to sonar school in Florida. He complained to the personnel officer there that he was supposed to be sent to "computer school" and was told that it was too late. He did not complain to his commanding officer at sonar school but did go to speak with the chaplain and a doctor at the base hospital. He remained at sonar school for a year and three months.

After completing sonar school, petitioner was assigned to a ship as a sonar technician and unsuccessfully attempted to secure an honorable discharge from the Navy on grounds of incompatibility. His grievance continued to be his belief that the Navy had misled him as to the type of training he would receive.

During 1974 he refused to work and was brought before captain's mast, an informal trial presided over by the ship's captain. He explained his dissatisfaction with the Navy to the captain, who offered to help him secure an administrative separation. He did not follow up on the captain's offer because he believed himself entitled to an honorable discharge.

His four-year enlistment ended January 25, 1975, and on January 27, 1975, petitioner informed his ship's executive officer that since he had not received his reenlistment bonus, which was due on or before January 25, 1975, he considered his two-year extension agreement cancelled and was leaving.[3]

---

3. The delay in receiving a reenlistment bonus was undoubtedly the result of petitioner's reactivated efforts to be discharged from the Navy—which efforts he brought to the attention of the bursar. In any case, the Navy's failure to pay the bonus before the reenlistment period began would not constitute such a material breach of the agree-

Chief Wade Childers of the Navy's personnel department was petitioner's interviewer at the boot camp classification interview but did not specifically remember interviewing petitioner.[4] He testified that petitioner was in what the Navy refers to as the Advanced Electronics Field ("AEF") program and that this program is described in the Navy Recruiting Manual, which is issued to all recruiting personnel at the various recruiting offices. Recruiters are required to follow the manual's provisions in recruiting persons for the Navy.

Childers explained that there are five schools, which encompass approximately eight ratings, in the AEF program, e. g., data systems technician, electronics technician, aviation electronics technician, sonar technician, electronic warfare technician. Because of the advanced nature of the training required for these ratings the Navy requires as a prerequisite for eligibility for the AEF program a commitment of at least six years active duty. Section 7 of the United States Navy Recruiting Manual (NAVPERS 15838 A). Recruiters are instructed to inform every recruit who is a high school graduate and who scores 65 or better on his Armed Forces Qualification Test (petitioner scored 81), of the AEF program. Continued eligibility for the AEF program, however, hinges on the recruit's doing well on the battery of aptitude tests he takes during boot camp. Recruiters are also required to inform recruits of this. Also included in the manual is a warning to recruiters to "exercise all caution to ensure that individuals understand that specific schools, duty assignments (to include surface or submarine school) or a particular rating is not promised under this program." Recruiting Manual, § 7, B–2704.

Selection for a particular school is made by the Bureau of Naval Personnel based on the following seven criteria:

"a. Satisfactory completion of recruit training if applicable.

b. Results of basic battery and special aptitude tests.

c. Qualifications from a security viewpoint.

d. Special physical qualification, if applicable.

e. Meet specific school selection criteria.

f. Overall needs of the Navy.

g. Personal desires of the individual when compatible with the foregoing."

Recruiter's Guide, 6-yr. Advanced Electronics at 1. See also United States Navy Recruiting Manual (NAVPERS 15838 A), § 7, B–708. These criteria, listed in the Recruiter's Guide, are preceded by the following language:

"Enlistees in this program will not be guaranteed a specific school but rather they will be informed that they will be assigned to one of the service schools listed under the Advanced Electronics Field Program in Article B–2101, CRUITMAN."

During boot camp each recruit has a classification interview to determine his job in the Navy. If a recruit has remained eligible for the AEF program, he is then asked to list his order of preference of ratings. If a recruit refuses to list five choices he is told that he

---

ment as to excuse petitioner's continued performance.

The Navy has brought to the court's attention the fact that petitioner has now accepted part of his reenlistment bonus. Affidavit of Ensign Robert W. Mandell. Such an act is, of course, inconsistent with a repudiation of the contract. However, under the somewhat different circumstances of this employment contract, the court accords no weight to this fact and it plays no part in the court's decision. If rescission were otherwise available, restitution could be ordered as a condition thereof.

4. Childers' signature appears next to petitioner's on the bottom of the Enlisted Classification Record which is prepared at the time of the classification interview.

must do so or be dropped from the AEF program.

At the interview, an Enlisted Classification Record ("ECR") is typed up and the recruit's five rating choices, in his designated order of preference, are indicated under Coded Recommendations. Petitioner's first choice was data systems technician, followed in order by electronics technician, aviation electronics technician, sonar technican and electronic warfare technician. The interviewer does not make any recommendation himself; he simply records the recruit's choices.

Also listed on petitioner's ECR are the results of the various tests taken by him. Childers was asked to evaluate the reported number scores appearing on petitioner's ECR and characterized petitioner's scores on the arithmetic and general classification test as average, his score on clerical as below average and his scores on mechanical, sonar, radio and electronics technician selection tests as above average. Based on these test results, Childers testified that petitioner had no chance of getting a data systems technician rating, even though his scores were slightly above the Navy's minimum requirement for that rating.

Directly after the classification interview, the recruit goes to a reviewer who verifies, to some extent, the information reported on the ECR and is then sent to an office to execute an extension contract, if required.

The ECR is forwarded to the Bureau of Naval Personnel where selections for ratings are made by computer, based essentially on the applicant's order of choice, the Navy's requirements for various positions and the recruit's test scores. The recruit is notified of the selected rating while still at boot camp.

The Navy points out that the enlistment contract signed by petitioner on January 26, 1971 contained the following disclaimer:

"54. I have had this contract fully explained to me, I understand it, and certify that no promise of any kind has been made to me concerning assignment to duty, geographical area, schooling, special programs, assignment of government quarters, or transportation of dependents except as indicated on NAVPERS 601 13 1." Petitioner's Exh. 1, ¶ 54.

The original enlistment contract also included the following paragraph, which is immediately above petitioner's signature:

"26 Jan 71 Date — I affirm that no promise of guarantee of any kind has been made to me prior to enlistment/reenlistment regarding school assignment, duty assignment, or the rating/career field to which I will be assigned. I further understand that I am enlisting/reenlisting for a period of SR FOUR years." Id.

The recruiters in question did not testify at the hearing.

The Navy maintains that these disclaimers coupled with the Navy's regulations prohibiting recruiters from guaranteeing specific ratings lead to the conclusion that petitioner was not specifically promised "computer school." [5] The court finds otherwise.

Petitioner's testimony, which the court credits, was that he had no intention of enlisting for more than four years of active duty but was induced to extend for two additional years in exchange for computer training he believed would benefit him later in civilian life. This testimony is corroborated, to some extent, by the indication on his ECR that his first rating preference was data systems technician.

Additionally, the legal effect of the disclaimers is vitiated by their intrinsic ambiguity. Initially, the first disclaim-

---

5. While petitioner's use of the term "computer school" is somewhat imprecise in view of the five computer-related schools available in the AEF program, the court is of opinion that all of the parties involved, i. e., the recruiters and the interviewer, understood petitioner to mean the school for data systems technicians.

er ends with the unexplained language "except as indicated on NAVPERS 601 13 1", a reference petitioner could well have understood to be entirely consistent with the promises made to him.[6] *Cf. Shelton v. Brunson*, 465 F.2d 144, 147 (5 Cir. 1972).

Moreover, the second disclaimer indicates that the period of enlistment was four years. Under the totality of the circumstances, which includes petitioner's belief that this contract was erroneously drafted to provide for a four-year active duty enlistment instead of the agreed-upon six years of active duty —a belief the Navy encouraged—it would be manifestly unfair to hold petitioner bound by these disclaimers. According to petitioner's explanation of the events of January 26, 1971, which the court believes, he could very well have considered the waivers appropriate for one *really* enlisting for only four years of active duty but inapplicable to him because he was enlisting for six years active duty and was signing this incorrect contract, on the Navy's advice, only to expedite his departure on that day; fully believing a corrected contract would be executed later. Finally, petitioner testified that once he pointed out the error in the original contract and was told to sign it anyway, he stopped reading it and consequently never read the "fine print."

Nor can the extension agreement signed by petitioner which incorporates by reference all of the provisions of the original contract—including, according to the Navy, the disclaimers—bar petitioner's claim. As petitioner points out, it would be illogical to incorporate a disclaimer of promises into the extension agreement when the very reason for signing an extension agreement four years in advance of its effective date is the Navy's promise of special schooling.

Based on these facts, petitioner claims relief on three contractual theories: fraud in the inducement, no meeting of the minds on an essential element of the contract, and a failure of consideration. The gist of all these theories is that petitioner was not sent to the specific school promised him.

Questions going to the validity of reenlistment contracts are governed by general principles of contract law. *Peavy v. Warner*, 493 F.2d 748, 750 (5 Cir. 1974); *Johnson v. Chafee*, 469 F.2d 1216 (9 Cir. 1972); *Shelton v. Brunson, supra; Chalfont v. Laird*, 420 F.2d 945 (9 Cir. 1969); *Colden v. Asmus*, 322 F. Supp. 1163, 1164 (S.D.Cal.1971). The essential elements of a cause of action sounding in fraudulent inducement or misrepresentation in the making of a contract are (1) a false representation of a material fact, and (2) reliance thereon by the plaintiff, (3) to his detriment. See generally *Sabo v. Delman*, 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N. E.2d 906 (1957); *Classic Bowl, Inc. v. AMF Pinspotters, Inc.*, 403 F.2d 463 (7 Cir. 1968). The false representation may take the form of silence where there is a duty to speak. *Simpson Timber Co. v. Palmberg Construction Co.*, 377 F.2d 380, 385 (9 Cir. 1967); *Globe Steel Abrasive Co. v. National Metal Abrasive Co.*, 101 F.2d 489 (6 Cir. 1939); Williston on Contracts, § 1497. A duty to speak is held to arise when one has peculiar knowledge of a latent defect in a material element of the consideration to pass to the other. *Simpson Timber Co., supra;* Williston on Contracts § 1497. The misrepresentation is deemed material if it concerns a fact likely to influence the decision-making process, *Ettman v. Equitable Life As-*

---

6. In its brief the Navy related that "NAVPERS 001-13-1 states in relevant part as follows:
"I affirm no promise of guarantee of any kind has been made to me prior to enlistment/reenlistment regarding school assignment, duty assignment, or the rating or career field to which I will be assigned . . . ."
Respondent's Memorandum of Law in Opposition to Petitioner's Application for a Writ of Habeas Corpus at 24.

surance Society, 6 A.D.2d 697, 174 N.Y.S.2d 553 (2d Dep't 1958), aff'd, 5 N.Y.2d 1005, 185 N.Y.S.2d 262, 158 N.E.2d 124 (1959); Williston on Contracts § 1490, i. e. if the non-disclosure constituted an essential inducement to bargain. Classic Bowl, Inc., supra, 403 F. 2d at 466; McNabb v. Thomas, 88 U.S. App.D.C. 379, 190 F.2d 608, 610, cert. denied, 342 U.S. 859, 72 S.Ct. 86, 96 L. Ed. 646 (1951).

Here, it seems clear that the crucial point in the formation of the relationship between the parties was the classification interview at which the now contested two-year extension agreement was prepared. Prior to this time, petitioner was not obligated to serve more than the four years active duty he had originally intended to serve and the Navy was not committed to provide the extensive schooling under the AEF program.

■ There can be no question that petitioner's belief that he was going to "computer school" was a material factor in his decision to extend his active duty enlistment for two years. When he originally went to the Navy recruiter his thought was to enlist for no more than four years active duty. The Navy, through its recruiters, interested petitioner in the two-year extension primarily[7] on the basis of a promise of "computer school." The Navy was thus under an obligation to correct any erroneous assumptions known to it under which petitioner was proceeding.

■ Here, it is petitioner's testimony that he went to the classification interview without a list of five choices because he understood he had been promised "computer school" and so informed the interviewer. The interviewer, however, insisted that he list five choices, which he then did, naturally listing "computer school" as his first preference. Petitioner testified that the interviewer told him that listing the four alternatives was à mere formality. Childers, on the other hand, vigorously denied that he ever indicated to a recruit that listing five choices was just a formality and that if a recruit continued to insist on listing only one particular school, he would inform the recruit that he would have to be dropped from the AEF program. The court chooses to credit Childers' testimony on this point and must conclude petitioner was aware of the possibility that he might not receive a data systems technician rating.

The Navy, therefore, did not intentionally mislead petitioner into believing he was certain to receive his first choice of schooling. Accordingly, petitioner has failed to prove an essential element of his cause of action.[8]

■ Moreover, even if petitioner had established his claim of fraud in the inducement, the relief he seeks would still be unavailable to him. Rescission as a remedy does not inexorably follow the establishment of the fraud; more must be shown. One seeking rescission must also show that upon learning of the deception, he acted quickly and decisively to end the relationship. Western Casualty & Surety Co. v. Herman, 318 F.2d 50, 55 (8 Cir. 1963); cf. Apex Pool Equipment Corp. v. Lee, 419 F.2d 556,

7. In addition to the advanced schooling petitioner also received a higher rate of pay because of his enrollment in the AEF program and a reenlistment bonus. These factors, however, were clearly of subordinate importance, in petitioner's decision-making process.

8. There is, however, one aspect of the classification interview which the court finds troubling. As related above, Childers testified that based on petitioner's test scores there was no chance that he would receive his first choice. Knowing full well petitioner's belief that he was going to "computer school" and his strong desire to do so, the better practice would have been for the Navy, through the interviewer, to inform petitioner that there was no chance of his receiving his first choice. Certainly, the interviewer could then explain to petitioner that he would receive valuable, perhaps even comparable training, in other available ratings. The informed choice would then be petitioner's.

562 (2 Cir. 1969); *American Mannex Corp. v. Huffstutler*, 329 F.2d 449 (5 Cir. 1964); see also *Brooks v. Hooks*, 221 Ga. 229, 144 S.E.2d 96, 100 (1965); [9] or be held to have waived the defect inhering in its inception.

Here, petitioner first learned of the Navy's decision to send him to sonar school while still at boot camp. He complained and was told to wait until he went to the basic electricity and electronics school. This he did, and he cannot be faulted for relying on the Navy's advice in this respect. *Cf. Peavy, supra.* He renewed his complaint at the basic electricity and electronics school, was again put off and told to wait until he was actually at sonar school. Surely, at this point a glimmer of doubt as to the Navy's intention must have arisen in petitioner's mind. The court, however, will not charge petitioner with the time spent at the basic electricity and electronics school, relying as he did in good faith on the quasi-logical reason for waiting given by the Navy.

 However, when petitioner's efforts at sonar school to correct what he perceived to be a material alteration of his agreement with the Navy proved fruitless, he was then obligated to announce his intention to rescind the two-year extension agreement and to take whatever legal steps might prove necessary to enforce that intention. He could not, at that point, sit back and accept a year and three months of schooling he knew he would not have received but for the two-year extension agreement and later seek to rescind that agreement. Assuming fraud on the Navy's part responsible for inducing the execution of the extension agreement, petitioner's remedy of rescission was waived by his acquiescence.[10]

 There is yet another reason why the denial of the equitable relief of rescission is appropriate here. There is a complete absence of proof that the training petitioner received in sonar school is not the functional equivalent of the training he would have received as a data systems technician. Petitioner had the burden of proving that injury resulted from a difference in schooling, *e. g.,* that petitioner's prospect of civilian employment was adversely affected by the difference in training. *Mott v. Tri-Continental Financial Corp.,* 330 F.2d 468, 470 (2 Cir. 1964); *Classic Bowl, Inc., supra,* 403 F.2d at 466.

Nothing appears in the record of this case from which the court can conclude that training in the operation, repair and maintenance of computers as taught to data systems technicians is substantially different from training received by petitioner in the operation, repair and maintenance of sonar detection, underwater fire control and other oceanographic equipment. In fact, the uncontroverted testimony of Chief Terrence Oscar Platz, petitioner's superior in the Navy for over two years, was that petitioner has worked for months on the Mark 114 computer system aboard ship

9. " 'Where a party who is entitled to rescind a contract on ground of fraud or false representations, and who has full knowledge of the material circumstances of the case, freely and advisedly does anything which amounts to a recognition of the transaction, or acts in a manner inconsistent with a repudiation of the contract, such conduct amounts to acquiescence, and, though originally impeachable, the contract becomes unimpeachable in equity. If a party to a contract seeks to avoid it on the ground of fraud or mistake, he must, upon discovery of the facts, at once announce his purpose and adhere to it. Otherwise he cannot avoid or rescind such contract.' *Gibson v. Alford,* 161 Ga. 672(5), 132 S.E. 442. See also *Manning v. Wills,* 193 Ga. 82(3), 90, 17 S.E.2d 261.

\* \* \* \* \*

"(a) There being no repudiation of the conduct charged as fraudulent, the petition fails to allege a cause of action for cancellation, injunction or any other equitable relief." *Id.*

10. For the same reasons, petitioner's other contractual claims, even if accepted, would not permit the equitable relief of rescission sought here.

and that his work is basically the same as that performed by a data systems technician, the only difference being in the type and function of the computers involved in the different ratings.

 Accordingly, petitioner's application for a writ of habeas corpus discharging him from the Navy is denied.[11]

The foregoing constitutes the court's findings of fact and conclusions of law. Rule 52(a), F.R.Civ.P.

So ordered.

The Clerk of the Court is directed to enter judgment in favor of the respondents and against the petitioner dismissing the petition.

11. Petitioner also contends that the Navy was obligated under its own regulations to cancel the extension agreement. BUPERS 1050150 (8) provides for mandatory cancellation of extension agreements by commanding officers "when a member, through no fault of his own, has failed to receive any of the benefits for which the extension was executed . . . [for example,] any special program for which he agreed to extend . . . ." As indicated above, the court finds that petitioner was promised "computer school", (training as a data systems technician), and did not receive this particular training.

However, petitioner is not entitled to relief on this theory for two reasons. First, it seems clear that petitioner did receive substantial benefits as the result of the two-year extension, i. e., over a year of advanced training, increased pay and a reenlistment bonus. Thus, it cannot be said that he failed to receive "any" benefits contemplated by the parties. Cf. Nixon v. Secretary of Navy, 422 F.2d 934, 936 (2 Cir. 1970).

Second, it cannot be said that petitioner's present situation occurred "through no fault of his own." Had petitioner timely raised his objections at sonar school, his commanding officer there may very well have viewed the problem differently from the view now taken by the Navy after petitioner has already received substantial benefits.

Finally, petitioner claims that his signing of the two-year extension agreement was not witnessed by a person authorized by Navy regulation to do so, in that the contract was signed in the presence of only an enlisted man, the classification interviewer, and the signature of Lieutenant Nicholas, which appears on the contract, must have been added later on. Petitioner's testimony concerning the chronology of events on February 23, 1971 was somewhat equivocal and the court is not convinced that petitioner actually signed the agreement in front of Childers rather than at some later point before Lieutenant Nicholas. In any event, there is no substantive effect to such a technical defect. Cf. Johnson, supra. Petitioner's argument that had he signed the agreement before Lieutenant Nicholas the confusion concerning the schooling would never have arisen is pure speculation.