USCA1 Opinion

 

United States Court of Appeals

For the First Circuit

No. 00-2392

RESOLUTION TRUST CORPORATION, AS RECEIVER;

HOME OWNERS SAVINGS BANK, F.S.B.,

Plaintiffs, Appellees,

v.

KEY FINANCIAL SERVICES, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

 Selya, Circuit Judge,

Stahl, Senior Circuit Judge, 

and Lynch, Circuit Judge.

 Daniel R. Warren, with whom Melissa M. Eckhause, and Thompson
Hine & Flory LLP, were on brief, for appellant.

 J. Scott Watson, Attorney, with whom Ann S. DuRoss, Assistant
General Counsel, Colleen J. Boles, Senior Counsel, and Jaclyn C.
Taner, Counsel, were on brief, for appellees.

February 12, 2002

 STAHL, Senior Circuit Judge. This case involves a
protracted dispute over a portfolio of loans sold by defendant-appellant, Key Financial Services, Inc. ("Key") to plaintiff-appellee, Home Owners Savings Bank ("Home Owners").(1) Key appeals
from a series of adverse rulings by the district court, culminating
in a court order that Key pay approximately $8.5 million in
restitution damages and interest. Finding Key's arguments without
merit, we affirm the rulings below.

I.

 In 1988, Key sold its interest in 335 first and second
residential mortgage loans (with a total principal value of
approximately $16.7 million) to Home Owners, a savings and loan
institution whose business, in part, consisted of acquiring
residential mortgage notes on the secondary market, at a price
equal to the full outstanding balance on the loans plus 1.5% of
their principal value. The parties executed a "Mortgage Loan
Purchase Agreement" ("Agreement"), specifying the terms of the
transaction. Section 2.5 of the Agreement delineated thirty-three
representations and warranties regarding the notes being
transferred, and § 3.1 specified that "the material breach of any
representation or warranty" contained in § 2.5 or other related
sections would require Key to repurchase, upon demand, the non-conforming mortgages.(2)

 When the New England real estate market began to collapse
in the early 1990s, certain loans acquired by Home Owners began to
underperform. Upon investigation, Home Owners determined that the
original property appraisals that accompanied some of the purchased
mortgages were artificially inflated. In addition, the title
insurance policies accompanying some of the loans included
exceptions that Home Owners believed were inconsistent with
representations made by Key in § 2.5(o) of the contract. The key
representation was that "[t]here is in full force and effect an
ALTA [American Land Title Association] Lender's Title Insurance
Policy or other generally acceptable form of policy of insurance
with standard condominium endorsements, if applicable, acceptable
to FNMA [Federal National Mortgage Association or "Fannie Mae"] or
FHLMC [Federal Home Loan Mortgage Corporation or "Freddie Mac"]." 
Despite this guarantee, Home Owners identified over 100 loans with
non-conforming policies. All of the mortgages in question were
originated(3) by U.S. Funding Inc. of America ("U.S. Funding") and
had title policies issued by Stewart Title Company. Most of the
U.S. Funding loans were second mortgages secured by residential
properties and belonged to the "C Program," meaning that the
consumer had a marginal credit history.

 After Key rebuffed Home Owners' demand that the disputed
mortgages be repurchased, Home Owners in 1989 filed suit in federal
court.(4) Count I of its complaint alleged breach of contract,
asserting that Key had materially breached its representation in 

§ 2.5(o) because the Stewart Title policies on the U.S. Funding
loans were not on ALTA forms and contained exceptions that did not
comply with Fannie Mae and Freddie Mac guidelines. Home Owners
sought relief under § 3.1 of the Agreement, which required Key to
repurchase all non-conforming loans. Key filed a cross-motion for
summary judgment, alleging, inter alia, that the title policies
issued for the subject properties were acceptable to Fannie Mae or
Freddie Mac, and therefore complied with § 2.5(o).

 Applying New York law,(5) the district court ruled in favor
of Home Owners in 1992, finding that Key had materially breached
the representations and warranties contained in § 2.5(o) in four
distinct ways because the title policies (1) did not insure against
real estate taxes that were presently due or past due; (2) included
a survey exception; (3) contained an exception regarding the rights
of tenants in possession broader than Fannie Mae or Freddie Mac 
permits; and (4) were not on ALTA forms and contained exceptions(6)
that "had the effect of neutralizing the standard ALTA protections
. . . thereby violat[ing] the relevant FHMLC [sic] or FNMA
Guidelines, which required that title policies be fully protective
of the lender." Home Owners Savings Bank v. Key Fin. Servs., Inc.,
No. 89-2366-WD, slip op. at 10 (D. Mass. Jan. 30, 1992)
(hereinafter "Slip Opinion"). Having found Key liable,(7) the court
gave the parties one week to submit a proposed final judgment to
bring the matter to a close. Id. at 16.

 The question regarding the proper amount of final
judgment turned out to be much more complicated than the district
court's order would have suggested, because a number of the U.S.
Funding loans had gone "off-line," meaning that the mortgages had
been removed from Home Owners' portfolio either because of
foreclosure or because the interest in the loan had been sold. The
parties disagreed as to how the off-line loans should be taken into
account when crafting a final judgment. Unable to reach a mutually
acceptable rationale, Home Owners filed a proposed judgment in May
1992, which Key opposed. Home Owners then filed a motion for
summary judgment on the issue of damages. 

 For some reason not ascertainable from the record, this
motion sat idle for three years. In September 1995, the case
received a jump start when Key filed a motion to dismiss for lack
of prosecution. At a status conference held shortly thereafter,
the court denied Key's motion to dismiss and denied without
prejudice Home Owners' motion for entry of judgment and motion for
summary judgment on the issue of damages to allow for further
development of the record. In March 1996, the parties filed cross
motions for summary judgment offering alternative theories
regarding the appropriate relief to which Home Owners was entitled: 
Key insisted that under the Agreement, its only obligation was to
repurchase the defective loans still in Home Owners' possession,
whereas Home Owners insisted that the relief should also take into
account the loans that had gone off-line. A month later, the
district court again ruled in favor of Home Owners. Specifically,
the court concluded that Key's failure to repurchase the non-conforming loans upon demand, as required by § 3.1, was an
independent breach of the Agreement. Accordingly, it found that
Home Owners was entitled to pursue general contract remedies for
breach of contract. The calculation of damages, however, was left
for further proceedings after both parties conducted discovery.

 Over the next three years, the district court was faced
with numerous discovery disputes and motions in limine regarding
the issue of damages. Finally, in 1999, the district court issued
an order awarding Home Owners damages and prejudgment interest
dating back to April 1990. See supra note 4. Finding that there
were no outstanding issues of material fact regarding the
computation of principal and interest, the district court on
September 29, 2000 entered final judgment for Home Owners in the
amount $8,509,609.64.(8) Key timely appealed.

II.

 On appeal, Key has not contested that the title insurance
policies for the mortgage notes originating from U.S. Funding are
inconsistent with its representations in § 2.5(o) of the Agreement. 
Instead, Key asserts that whatever breach it committed was not
material, and therefore it had no obligation to repurchase the
loans at issue. Specifically, Key argues that the district court
applied the wrong standard of materiality when it decided as a
matter of law to grant partial summary judgment in favor of Home
Owners with regard to the breach of contract claim. Furthermore,
Key insists that the issue of materiality is highly fact dependent,
thereby precluding resolution of the issue by motion for summary
judgment. 

 The district court found that Key materially breached the
representations and warranties in § 2.5(o) of the Agreement in the
various ways detailed supra. In determining whether Key's breaches
were material, the district court cited the standard articulated in
United States ex rel. Roman v. Schlesinger, 404 F. Supp. 77, 85
(E.D.N.Y. 1975), which asks whether "a misrepresentation . . .
concerns a fact likely to influence the decision-making process." 
Slip Opinion at 12. Key, on the other hand, maintains that under
New York law, a breach of contract is material only if it "goes to
the essence of the contract. That is, a breach is material if it
defeats the object of the parties in making the contract and
deprive[s] the injured party of the benefit that it justifiably
expected." Times Mirror Magazines, Inc. v. Field & Stream Licenses
Co., 103 F. Supp. 2d 711, 731 (S.D.N.Y. 2000) (internal quotations
omitted). 

 We reiterate that Key has not contested the determination
that the title policies for the U.S. Funding loans were deficient
in the ways explained by the district court;(9) rather, Key argues
that these deficiencies should not be considered material in light
of the intentions of the parties -- particularly regarding loan
resale -- at the time they entered into the Agreement. Key's
proposed analysis of the issues in this case would be proper if
Home Owners had argued that Key's breaches were so material as to
entitle it to walk away from the Agreement entirely. But in this
case, Home Owners just seeks repurchase of the loans with defective
title policies, which only comprised approximately one-third of the
mortgage notes involved in the original sale. Rather than
attempting to "unwind the transaction," Home Owners is merely
asserting its rights under the Agreement, which provided that "[i]n
the event of the material breach of any representation or warranty
set forth in Section[] '2.5' . . . Key hereby agrees, upon demand,
to repurchase any Mortgage note with respect to which there shall
have been a material breach . . . ." 

 The district court's characterization of this case as one
involving rescission without any further explanation, see Slip
Opinion at 1, may have caused some confusion. Home Owners did not 
seek the complete dissolution of the Agreement, but rather simply
wanted Key to repurchase a particular subset of loans -- the U.S.
Funding loans with non-conforming title policies -- as the
Agreement specified. Therefore, while the district court's
reliance on the materiality standard from Schlesinger, a fraudulent
inducement case, may not have been directly on point, Key's
citation of the Times Mirror materiality test, which was crafted in
the context of a case where the nonbreaching party sought
rescission from the court rather than seeking relief based on a
contractual provision, is inapposite as well.(10) The appropriate
question is whether the title deficiencies constituted a material
breach of the representations and warranties contained in § 2.5(o),
and not whether the representations made in § 2.5(o) were material
to the Agreement as a whole. Accordingly, we find that the
district court properly determined as a matter of law that Key
materially breached § 2.5(o) of the Agreement due to the
deficiencies in the U.S. Funding loans' title policies, thus
triggering the repurchase remedy provided in § 3.1. Key's attempt
to inject disputed issues of fact into the case is inappropriate
and reflects its misunderstanding of the significance of the term
"material."(11) Therefore, we affirm the district court's rulings
regarding liability.(12)III.

 We now turn to the issue of damages. Key first contests
the district court's determination that it committed an independent
breach by failing to repurchase the loans upon Home Owners' demand,
thus entitling Home Owners to general contract damages. Key claims
that repurchase is Home Owners' sole remedy under the contract, and
therefore, awarding general contract damages provides Home Owners
with a windfall.(13) Key's argument is misplaced. Whether or not Key
committed an independent breach by failing to repurchase on demand,
the district court was free to make Home Owners whole, and it did
so in terms of the obligation imposed by the contract. 

 Had Key repurchased the loans at the time of the initial
demand, the parties (and the district court) would not have been
faced with the complicated question of how to deal with the
numerous loans that subsequently went off-line. Home Owners
obviously would have preferred that Key repurchase the loans back
in 1989, rather than find itself trying to determine years later
the amount of monetary damage resulting from Key's failure to do
so. A repurchase provision is designed to shift the risk to the
selling party in the event that a dispute arises.(14) Key's position
-- that on a finding of material breach of contract the judge was
precluded from awarding damages equal to the repurchase amount --
makes no sense in light of the fact that the provision negotiated
by the parties states that Key will repurchase "upon demand." More
than arguably, Key appears to be the party that is trying to take
advantage of whatever "windfall" will result from the fact that the
vast majority of the disputed loans have gone off-line.(15) Key and
Home Owners, two sophisticated parties, negotiated how the risks
and costs of this transaction would be distributed, and resolved
the issue by drafting § 3.1. Key's cries of injustice fall on deaf
ears, as Key freely contracted for the obligations by which it now
finds itself bound.(16)

 Likewise, we discern no error in the district court's
determination of the appropriate amount for the judgment. The
district court was satisfied that it had sufficient information
before it to enter judgment, and found no merit in Key's arguments
suggesting that there was inadequate documentation. We find no
reason to quibble with the district court's assessment. Had Key
satisfied its repurchase obligation immediately, many of these
arguments over documentation would never have materialized.

IV.

 After almost a decade of litigation, which helped to make
the record below not always a model of clarity, we are satisfied
that the various rulings and final judgment ultimately entered by
the district court were sound. 

Affirmed. Costs to Appellees.

 

1. In 1995, Home Owners Savings Bank was placed in
receivership. The Resolution Trust Company ("RTC") entered its
appearance as receiver in July 1995. The Federal Deposit Insurance
Company ("FDIC") became the statutory successor to RTC on January
1, 1996. For purposes of this opinion, however, "Home Owners" will
be used to refer collectively to the original plaintiff and its
successors in interest. 
2. Section 3.1 states, in relevant part, "In the event of the
material breach of any representation or warranty set forth in
Sections '2.5', '2.6' and '6.1', Key hereby agrees, upon demand, to
repurchase any Mortgage note with respect to which there shall have
been a material breach as set forth above . . . ."
3. The vast majority of the loans sold by Key were purchased
on the secondary mortgage market. The term "originator" refers to
the lender who initially dealt with the customer.
4. Home Owners maintains that it made its first written demand
that Key repurchase all of the U.S. Funding loans on June 15, 1989,
and reiterated this demand orally on August 30, 1989. When Key
"unequivocally rejected" this demand by letter dated August 31,
1989, Key filed suit. Key, on the other hand, insists that Home
Owners did not formally demand that Key repurchase the disputed
mortgages until April 6, 1990. As the district court began its
calculation of damages from the April 1990 date, any dispute over
this point amounts to nothing of importance. 
5. Section 8.5 of the written contract explicitly states that
the Agreement "shall be construed under the laws of the State of
New York."
6. Specifically, the non-ALTA title policies contained an
exception for statutory mechanic's liens and excluded any matter
arising or occurring before the date the borrower acquired title.
7. In addition to the first count for breach of contract, Home
Owners' complaint included a second count of misrepresentation and
a third count under Mass. Gen. Laws ch. 93A, which alleged that Key
had also breached representations concerning the appraisals on the
property securing some of the mortgage notes and challenged Key's
loan origination practices. In its first motion for partial
summary judgment, Home Owners only sought relief under Count 1,
which it claimed was amenable to resolution as a matter of law,
because a favorable ruling on this count would be sufficient to
establish Key's liability. Home Owners also filed a second motion
for summary judgment, however, asking the court to reject Key's
alleged affirmative defenses of estoppel and waiver regarding the
issue of the allegedly faulty appraisals. The district court
agreed with Home Owners' assessment and based its ruling solely on
Count 1. Nevertheless, the court also granted Home Owners' second
motion for partial summary judgment dismissing the affirmative
defenses, a ruling which Key has not appealed. Accordingly, we
focus solely on the breach of contract claim. 
8. The judgment also awarded litigation costs, post-judgment
interest and photocopying expenses to Home Owners.
9. At oral argument, appellant's counsel specifically stated
that Key was "not contesting . . . that the exceptions in the title
policy were not consistent with the [Fannie Mae and Freddie Mac]
guidelines in effect at that time."
10. Rather than turning to pure rescission cases or fraudulent
inducement cases for guidance, we find this case to be particularly
analogous to a case involving the breach of an express warranty. 
Key warranted that the loans would be Fannie Mae and Freddie Mac
compliant, and that the title policies would be on ALTA forms,
thereby incorporating the standard protections included thereon. 
These explicit warranties were breached. Because there can be no
dispute about the existence of these express warranties, it appears
that, under New York law, Home Owners need not even prove that it
had actually relied on the warranties when entering into the
transaction. See CPC Int'l Inc. v. McKesson Corp., 513 N.Y.S. 2d
319, 323 (Sup. Ct. 1987) ("This court declines to require a finding
of reliance to permit recovery for breach of the warranties in the
contract."); see also SCBS Inc. v. Ziff-Davis Publ'g, 553 N.E.2d
997, 1001 (N.Y. 1990) (affirming the CPC court's "view of
'reliance' . . . as requiring no more than reliance on the express
warranty as being a part of the bargain between the parties"). 
11. For example, Key's proffered evidence suggesting that other
participants in the secondary mortgage market would have found the
title policies acceptable is irrelevant to the question of whether
Key materially breached the representations and warranties it
expressly made in § 2.5.
12. We likewise affirm the district court's evidentiary rulings
that excluded any evidence regarding Home Owners' alleged
intentions at the time it entered into the transaction.
13. In making its argument, Key refers specifically to the last
sentence of § 3.1, which provides: "Except for the indemnities
provided in Section '7,' [repurchase] is the sole and exclusive
remedy for any material breach of any representation or warranty as
herein provided."
14. For this reason, it is irrelevant that the loans may have
suffered a loss in value because of changing market conditions
rather than because of the deficiencies in the loans' title
policies. Section 3.1 obligated Key to repurchase these faulty 
mortgages upon demand, meaning that from the moment a proper
repurchase demand was made, Key -- not Home Owners -- should have
borne the risk of any market fluctuations.
15. In fact, the district court's calculation of damages merely
represents what Key would have paid Home Owners had it repurchased
the loans when it was supposed to have done so (using the date most
favorable to Key -- April 1990), plus statutory interest from that
date, plus the costs of mitigation and servicing, less the payments
received on account of the loans from the date of demand to the
date of judgment. The court is unpersuaded by Key's argument that
this judgment somehow results in a "windfall" for Home Owners.
16. We find it to be of no significance that the district court
reached its determination regarding the appropriate damage award by
characterizing Key's failure to repurchase the loans upon demand as
an independent breach of the contract. The judgment can just as
easily be characterized as "make-whole" relief for the non-breaching party in light of the fact that the prenegotiated remedy
provision had failed in its purpose because many of the loans had
gone off-line.