**Alfred M. FRANKEL, et ano., Plaintiffs,**

v.

**ICD HOLDINGS S.A., et al., Defendants.**

No. 96 Civ. 1141 (LAK).

United States District Court,
S.D. New York.

June 10, 1996.

Ira S. Sacks, Alex Lipman, Fried, Frank, Harris, Shriver & Jacobson, for Plaintiffs.

Robert A. Weiner, Y. David Scharf, McDermott, Will & Emery, for Defendants.

## OPINION

KAPLAN, District Judge.

In January 1994, plaintiffs, then the owners of ICD Group, Inc. ("ICD"), one of the

largest international dealers in petrochemical based commodities, sold all of their ICD stock to ICD Holdings S.A. ("Holdings"), an entity formed by two of their key employees, Dirk de Geus and Peter Loeffelhardt, for the purpose of acquiring ICD in a management buyout. Part of the consideration for plaintiffs' stock was subordinated notes of Holdings in the aggregate principal amount of $5 million (the "Notes"). The Notes were secured by absolute and unconditional guarantees executed by ICD Group B.V. ("B.V."),[1] de Geus and Loeffelhardt (the "Guarantees").

As sometimes occurs in acquisitions in which, like this one, the ultimate purchase price is to be determined by reference to a balance sheet to be prepared after the closing, the Buyers[2] in time claimed that the closing balance sheet was fraudulent and refused to pay the Notes. The sellers thereupon commenced this action in New York Supreme Court by moving for summary judgment on the Notes and Guarantees in lieu of complaint. See N.Y. CPLR § 3213 (McKinney 1992). Defendants removed to this Court and resist summary judgment, principally on the ground that the alleged fraud is a defense to the Notes and Guarantees.[3]

## Facts

### Background

Prior to the events at issue here, ICD traded in over one hundred products and had holdings around the world. It was the ultimate parent entity of B.V., and all of its common stock was owned by plaintiffs Alfred M. Frankel and Jacques Leviant.

In 1993, Messrs. de Geus and Loeffelhardt were managing directors of, and were part of the management team that controlled, the commercial aspects of ICD's European and Russian operations. (de Geus Aff. ¶ 5) Indeed, they were its most senior officials and ran the day to day operations of B.V.

(Frankel Decl. ¶ 9) Anxious to obtain a greater share in the profits of those operations, they discussed with plaintiffs a number of options to accomplish that goal. (de Geus Aff. ¶ 6) According to defendants, plaintiffs were interested in selling because they were concerned about the economic environment in Europe and Russia. (Id. ¶ 7)

### The Buyout Transaction

The parties agreed on a buyout transaction in late 1993 or the first days of 1994. (Id. ¶¶ 6, 14, 15 & Ex. D) De Geus and Loeffelhardt caused Holdings to be organized to serve as the acquisition vehicle, and the transaction was structured as a purchase by Holdings of all of the common stock of ICD. (See id. ¶ 7)

### The Purchase Agreement

The Purchase Agreement provided that the purchase price would be:

"determined as an amount equal to the Book Value (as defined in Section 1.04) less $900,000 (subject to final adjustment as agreed by the parties ...), plus an additional contingent Purchase Price set forth in Section 6.03 below." (Id. Ex. D § 1.03(a))

"Book Value" was to be determined from a special purpose consolidated statement of net assets as of September 30, 1993, as adjusted (the "Balance Sheet"). (Id. Ex. D § 1.04) The parties agreed that Book Value would be determined by Richard A. Eisner & Co., ICD's certified public accountants. (Id.)

As is typical, the transaction contemplated the preparation of a preliminary balance sheet, which would provide the basis for the closing, with the price subject to subsequent adjustment upon the preparation of the definitive Balance Sheet later on. Section 1.05(a) of the Purchase Agreement provided in pertinent part that the accountants would:

---

1. B.V. was a wholly owned subsidiary of ICD. As a result of the transaction at issue, it became an indirect wholly owned subsidiary of Holdings. (De Geus Aff. Ex. B)

2. Holdings, B.V., de Geus and Loeffelhardt sometimes are referred to collectively as the "Buyers."

3. Following the commencement of this action, B.V. filed a petition for relief under the Bankruptcy Code. By order dated March 12, 1996, the Bankruptcy Court stayed prosecution of the claims against B.V.

"deliver the Balance Sheet (which shall be binding on the parties absent manifest error) (or if Eisner has not completed the Balance Sheet, a preliminary Balance Sheet reflecting Eisner's then current good faith estimate of Book Value) (the 'Preliminary Balance Sheet') ... as well as a calculation, based upon the Balance Sheet (or the Preliminary Balance Sheet) ... of the Purchase Price and the portion thereof payable in cash at the Closing (the 'Estimated Cash Purchase Price')." (*Id.* Ex. D § 1.05(a))

In the event the transaction closed on a Preliminary Balance Sheet, plaintiffs were obligated to deliver the Closing Balance Sheet and a determination of the Final Cash Purchase Price within thirty days thereafter. (*Id.* Ex. D § 1.05(b)) If the Closing Balance Sheet indicated that the Buyers had overpaid, Holdings was entitled to return of the overpayment. (*Id.* Ex. D § 1.05(c))

The Purchase Price was to be paid in cash plus two Notes aggregating $5 million. (*Id.* Ex. D § 1.03(c)) Significantly, the agreement provided that the amount of any post-closing adjustment in the price would be paid promptly (*id.* Ex. D § 1.05(c)); there is no suggestion in the Agreement or the Notes that the Buyers would be paid (or accept) the return of any overpayment in the form of a reduction in the principal amount of the Notes.

It was a condition to the obligation of each side to go forward with the transaction that the Estimated Cash Purchase Price be within ten percent of $67.8 million. (*Id.* Ex. D §§ 7.05, 8.04) De Geus claims that the sellers knew that the Buyers would not proceed with the transaction if the Estimated Cash Purchase Price was less than ninety percent of the $67.8 million figure. (*Id.* ¶ 11)

*The "Open Items"*

As indicated above, part of the purchase price was described in the Purchase Agreement as "additional contingent Purchase Price set forth in Section 6.03" of the Agreement. (*Id.* Ex. D § 1.03(a)) Section 6.03 provided in relevant part that the sellers would be entitled, as additional contingent Purchase Price, to a percentage of the Closing Date Profits of Holdings and certain subsidiaries for each fiscal quarter, beginning with the quarter ending December 31, 1993. Insofar as is relevant here, "Closing Date Profits" for any quarter was defined as "the net cash profit (or loss) realized in such quarter from any contract or other item of value not reflected on the Balance Sheet which arose before October 1, 1993 (certain of which are set forth in Exhibit 6.03(4)), including, without limitation, arising from the relationship with V.O. Soyuzchim Export ..." (*Id.* Ex. D § 6.03(a)(4)) Exhibit 6.03(4) to the agreement listed sixteen "open items" and stated that all adjustments that would result therefrom would be split between the sellers and the Buyers in the ratio of 70/30 "and excluded from the contingent purchase price calculation." (*Id.* Ex. E) In a number of cases listed, the Exhibit makes clear that the parties did not have September 30, 1993 financial results at the time the transaction was negotiated and closed. (*E.g., id.* Ex. E ¶¶ 2, 8)

*The Notes and Guarantees*

The form of the Notes was specified in the Purchase Agreement. They are not simple IOUs. Rather, they are fourteen page, single spaced instruments containing extensive specifications of events of default, subordination provisions, definitions, and tax and other provisions specifically designed for this transaction. Section 15 of each Note provides:

> *"Obligations Absolute.* The payment obligations of the Company [Holdings] under this Note shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Note under all circumstances, including, without limitation, the following circumstances:
>
> "(i) the existence of any claim, set-off defense or other right which the Company or any other person may have at any time against the Holder or any other holder whether in connection with this Note, the Acquisition Agreement, the transactions contemplated herein or therein, or any unrelated transaction; or
>
> "(ii) any other circumstances or happening whatsoever, whether or not simi-

lar to any of the foregoing." (*Id.* Ex. F § 15)

The form of the Guarantees also was specified in the Purchase Agreement. They provide:

"Each of the undersigned stockholders of ICD Holdings S.A. (the 'Company'), a Luxembourg corporation, and ICD Group, B.V., hereby jointly and severally irrevocably and unconditionally guarantees to the Holders of this Note that the Company will pay and perform as required therein the Company's obligations under this Note.

"This Guaranty is an absolute, unconditional, present and continuing guaranty of payment and not of collectibility and is in no way conditioned or contingent upon any attempt to collect from the Company or upon any other condition or contingency.

"This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereof." (*Id.* Ex. G)

*The Closing*

On March 28, 1994, Eisner delivered a Preliminary Balance Sheet, a statement of the Estimated Cash Purchase Price and the list of open items contemplated by the Purchase Agreement. (*Id.* ¶ 14 & Ex. H, I and E) The Estimated Cash Purchase Price was $64,933,450, which satisfied the condition that the price fall within ten percent of $67.8 million. (*Id.* ¶ 14) The total estimated purchase price, taking account of the Notes, therefore was just under $70 million. (*Id.*) At the Closing, which occurred on March 30, 1994, the Buyers transferred $64,933,450 in cash to the sellers and signed and delivered the Notes and Guarantees. (*Id.* ¶ 15 & Ex. D)

In May 1994, plaintiff Frankel advised de Geus that Eisner had made a $1.5 million arithmetic error in computing the price, and plaintiffs immediately wired the overpayment to the Buyers. (*Id.* ¶ 18; Frankel Decl. ¶ 22)

*The Dispute Arises*

The Closing Balance Sheet is dated May 31, 1994. (de Geus Aff. Ex. L) The parties disagree, however, as to when it was provided to defendants. According to Frankel, it was turned over on or about the date of the report. (Frankel Decl. ¶ 23) De Geus claims it was not produced until December 1995. (de Geus Aff. ¶ 23) The Court therefore assumes the latter date for purposes of this motion.

By the summer of 1995, the Buyers were looking for an adjustment of the purchase price in their favor. In a July 21, 1995 letter, de Geus took the position that there had been an overpayment of at least $2 million, although he professed an inability to determine the amount precisely. He suggested that the sellers make an interim payment in that amount. (de Geus Aff. ¶ 20 & Ex. J)

*The November 1995 Moret Ernst & Young Report*

In November 1995, the Buyers retained Moret Ernst & Young ("Moret") to review the "open items," including the status of ICD's Russian subsidiaries. De Geus claims that Moret's November 1995 report "uncovered that the Balance Sheet failed to account for the 'open items' and thus was materially overstated or otherwise unsubstantiated by approximately $4.7 million." (de Geus Aff. ¶ 21) De Geus' characterization, however, mischaracterizes the Moret report, a copy of which is attached to de Geus' affidavit. (*Id.* Ex. K)

The face of the Moret report explicitly contradicts de Geus' broad assertion that Moret examined Eisner's treatment of the "open items" and concluded that Eisner had failed to account for them. The procedures Moret carried out were "limited to the items 8 (AOZT Versus) and 12 (Hisparus) of exhibit 6.03(4)." [4] (de Geus Aff. Ex. K, at 3) Nor did Moret reach any conclusions as to Eisner's treatment of those two items. The report begins by stating that Moret had not, as of November 14, 1995, completed the audit for the fifteen month period ending Septem-

4. AOZT Versus and Hisparus are 100 percent and 70 percent owned indirect subsidiaries of

Holdings. (de Geus Aff.Ex. B)

ber 30, 1994 because, among other things, it had not yet received audited financial statements and audit clearance for Hisparus and AOZT Versus for the relevant period. (*Id.* at 1) Indeed, it goes on to say that it was "informed by Ernst & Young Moscow that it would be a great problem, if not impossible, to prepare the audited financial statements as per September 30, 1993." (*Id.* at 2)

In the absence of any audited financial data for these two Russian subsidiaries, the Buyers provided Moret with their own calculation of their dollar equity value as of September 30, 1993. While Moret reviewed the Buyers' calculation, they did nothing more than check the arithmetic and exchange rates and verify that the Buyers' treatment of Russian value added tax was consistent with prior financial statements. They disclaimed any meaningful opinion:

> "In our opinion, the methodology used to arrive at the approximate dollar net equity value as at September 30, 1993, *given the circumstances,* is acceptable. *Because the above procedures do not constitute an audit in accordance with generally accepted auditing standards, we do not express an opinion. We make no representation regarding the sufficiency of the foregoing procedures for your purpose.*" (Emphasis supplied)

Thus, by its own admission, Moret was in no position, and did not purport, to determine the financial results or the equity value of those subsidiaries.

### The January 1, 1996 Interest Payment

Pursuant to the terms of the Notes, interest payments of approximately $113,000 were due on January 1, 1993. (de Geus Aff. ¶ 25) By letter dated December 28, 1995, the Buyers' counsel took the position that the Buyers had overpaid by at least $4.7 million and probably as much as $7 to $8 million. They purported to direct that approximately $113,-000 of the alleged overpayment be applied to the interest payments and the balance to

reduce the principal amount of the Notes. (*Id.* Ex. N)

### The 1996 Moret Report

After the commencement of this litigation, Moret rendered a second report to Holdings, this one for the purpose of commenting on the treatment of the "open items" in an "attached draft settlement." (*Id.* Ex. O) Unfortunately, defendants have not seen fit to submit the attachment to the Moret report, so it is not entirely clear what "draft settlement" the report was talking about, although the text of the report indicates that it probably was a draft of the Buyers' calculation of the Book Value. Nevertheless, it is plain from the materials submitted, as well as the comments of counsel at oral argument, that the two principal bones of contention are AOZT Versus and Hisparus, which the Buyers claim had negative equity values of $827,-090 and $3,844,370 at September 30, 1993, respectively. The suggestion by defendants is that the Balance Sheet improperly failed to reflect these sums, which would have reduced the purchase price. Perhaps so.[5] Moret, however, does not say that. What is most striking about the 1996 Moret report is the basis for the conclusion that these two entities have the indicated negative equity values.

Moret's report begins with the statement that the procedures it performed:

> *"were designed to be responsive to management's [i.e., Holdings'] objectives* and were approved by management prior to their performance. Because the adequacy of the procedures for management's purposes is dependent upon a number of subjective factors, *we have no opinion as to whether or not these procedures are adequate for such purposes.* Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

> *"Our findings and observations are a result of the Company's staff representations and the Company's accounting records.*

---

5. On this record, there is no basis for reaching a definitive conclusion as to whether the equity value of Hisparus and AOZT was included in the preliminary or Closing Balance Sheets prepared by Eisner, although the facts that (i) these mat-

ters were listed as "open items" in the contract and (ii) neither party had up-to-date financial statements for them at the time of the Closing perhaps suggests that they neither were included nor intended to be included.

*The procedures performed were not sufficient to obtain an opinion with respect to the completeness and correctness of these records and therefore we cannot and will not express an opinion on the completeness and correctness of the calculation underlying the draft settlement."* (*Id.*) (Emphasis supplied)

*1. AOZT Versus.* The report then proceeds, as far as is relevant here, to consideration of the $827,090 negative equity value assigned to AOZT Versus. It indicates that Holdings advised Moret that, at the end of *November 1995,* ICD's books showed a receivable from AOZT Versus that was $8 million less than the amount that the Buyers claimed was due. The Buyers advised Moret that the receivable was uncollectible and that, in the Buyers' opinion, $3.4 million of the shortfall was allocable to the period June 30, 1993 through September 30, 1993, *i.e.,* before the closing. This of course appears to be the source of the allegation that there was a negative equity value at September 30, 1993. Moret, however, refused to express any opinion on the subject, commenting that "[t]he position taken [by the Buyers] is one which includes a number of subjective factors, and we cannot and will not express an opinion on this part of the draft settlement." (*Id.* Ex. O at 5–6)

*2. Hisparus.* Moret's comments regarding Hisparus and its alleged negative equity of $3,844,370 at September 30, 1993 are simply a repetition of the statements contained in the November 1995 letter.

It should be noted that defendants have submitted an affidavit of a partner of Moret which states that "[i]t appears that the open items were not accounted for in [Eisner's determination of] the Final Cash Purchase Price." (Goedkoop Aff. ¶ 3) The affidavit does not explain the basis for this statement and simply refers the reader to Moret's two reports. (*Id.* ¶ 4)

6. De Geus and Loeffelhardt are "Shareholders" within the meaning of, and agreed to be bound by, the Agreement. (de Geus Aff. Ex. D at 44) While they explicitly consented to service by registered mail, Section 10.10 of the Purchase

*Discussion*
*Personal Jurisdiction*

De Geus and Loeffelhardt are subjects of the Netherlands and Spain, respectively. Both were served by registered mail. Accordingly, before proceeding to the merits of this dispute, the Court must consider their cross-motion to dismiss the action as against them on the ground that they are not subject to the personal jurisdiction of this Court.

Section 10.11 of the Purchase Agreement provides in relevant part:

*"Each of the parties (including the Shareholders)* hereto hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the State of New York and of the United States of America, in each case located in the County of New York, for *any Litigation arising out of or relating to this Agreement and the transactions contemplated hereby . . . and further agrees that service of any process, summons, notice or document by U.S. registered mail to its respective address set forth in Section 10.10 shall be effective service of process for any Litigation brought against it in any such court."* (de Geus Aff. Ex. D § 10.11) (Emphasis supplied)

De Geus and Loeffelhardt were served in accordance with the terms of the Agreement.[6] Accordingly, they have no proper objection to personal jurisdiction. *E.g., Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 14, 105 S.Ct. 2174, 2182 n. 14, 85 L.Ed.2d 528 (1985); *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315–16, 84 S.Ct. 411, 414–15, 11 L.Ed.2d 354 (1964); *Reed & Martin, Inc. v. Westinghouse Electric Corp.,* 439 F.2d 1268, 1276 (2d Cir. 1971). Their cross-motion to dismiss is frivolous and is denied.

*The Notes*

*Default*

■ Defendants' next line of defense is to assert that there is a genuine issue of fact as

Agreement failed to set forth an address for them. (*Id.* Ex. D § 10.10) They were served at their respective current addresses and admit that they received service. (*Id.* ¶ 27)

to whether any default occurred. They contend that they are not in default because they instructed plaintiffs to apply toward payment on the Notes part of the amount they claim they overpaid for the purchase of the ICD stock. In substance, defendants seek to set off their unresolved claim of overpayment against the payments expressly called for by the Notes.

The question of which side will retain or, indeed, recover money or property pending resolution of a dispute as to ownership often is of great practical importance. It can affect a party's cash flow or solvency *pendente lite,* and possession may significantly alter the combatants' relative bargaining positions while the dispute goes on. In consequence, sophisticated parties to commercial transactions may contract that one party or the other shall be entitled to hold or, indeed, be paid disputed sums pending final resolution of a controversy.[7]

The Notes provide that the payment obligations thereunder are "unconditional and irrevocable ... under all circumstances, including, without limitation, ... the existence of any claim, set-off defense or other right which the Company ... may have ... against the Holder ..."[8] (de Geus Aff. Ex. F, at 13) Since the waiver of "any ... set-off defense" is more than sufficiently specific to satisfy New York law, a subject discussed in much greater detail below in another connection, the Buyers had no right to set off against payments due on the Notes any amount they claim they are owed by reason of the alleged overpayment.

Defendants contend that their position is supported by Section 1.05(c) of the Purchase Agreement, which provides in relevant part:

"If the Final Cash Purchase Price is greater than the Estimated Cash Purchase Price, Buyer shall promptly pay to (or as

directed by) Sellers the amount of the difference. If the Final Cash Purchase Price is less than the Estimated Cash Purchase Price, Sellers shall promptly pay to (or as directed by) Buyer the amount of the difference." (de Geus Aff. Ex. D § 1.05(c))

The argument is that since the purchase price computed in accordance with the Purchase Agreement, in the defendants' view, was smaller than the "Estimated Cash Purchase Price," defendants were entitled to have the plaintiffs pay the alleged overpayment "as directed by" the defendants. The argument is unavailing.

Section 1.05(c) must be read in a manner consistent with the other terms of the Agreement. The Notes made the obligations they represented unconditional and irrevocable, irrespective of any set-off defense or other claim. In all the circumstances, it is perfectly clear that defendants bargained away any right they may have had to set off any claimed overpayment against their obligations on the Notes. To read Section 1.05(c) as permitting the Buyers to direct the plaintiffs to pay a disputed amount as instructed would be inconsistent with that view and do violence to the expressed intention of the parties. In consequence, defendants' failure to make the interest payments concededly due on January 1, 1996 constituted an Event of Default under each of the Notes. (de Geus Aff. Ex. F § 5)

*Availability of the Alleged Fraud Defense*

■ Defendants next contend that their claim of fraud in the inducement precludes the entry of summary judgment against them on the Notes and the Guarantees. They rely on *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959), and its progeny for the proposition that a Note or Guarantee is subject to a fraudulent

---

**7.** This is well illustrated by a commercial landlord-tenant dispute in which the New York courts held that a tenant was obliged by a lease provision to pay promptly, subject to a later suit for a refund, a landlord's claim for certain additional rent, notwithstanding the existence of a *bona fide* dispute as to whether the amounts claimed were properly due under other terms of the lease. *J. Henry Schroder Bank & Trust Co. v. South Ferry Building Co.,* 88 A.D.2d 570, 571, 451 N.Y.S.2d 86, 88–89 (1st Dept.1982); *South Ferry Building*

*Co. v. J. Henry Schroder Bank & Trust Co.,* 122 Misc.2d 595, 596, 473 N.Y.S.2d 94, 95 (App.T. 1st Dept.1983), *mod'g,* 114 Misc.2d 1045, 453 N.Y.S.2d 563 (N.Y.City Civ.Ct.1982). In substance, the same is true here.

**8.** The Purchase Agreement contained substantially identical language. (de Geus Aff. Ex. D § 10.15)

inducement defense, even if it is "absolute and unconditional" by its terms, unless there is a specific disclaimer of that defense. They contend that there is none in these instruments.

*Danann* was an action by the purchaser of a lease which claimed that it had contracted to buy the lease in reliance on fraudulent misrepresentations by the seller as to the operating expenses and profits of the building. The contract of sale provided that all prior agreements and understandings were merged in the contract, that neither party relied upon any statements not set forth therein, and that the seller had not made any representations as to the expenses or operation of the premises. The New York Court of Appeals held that these specific disclaimers of representations of the sort upon which the plaintiff allegedly relied precluded assertion of the fraud claim, although it observed that a general and vague merger clause would not have done so. 5 N.Y.2d at 320–21, 184 N.Y.S.2d at 602, 157 N.E.2d at 601.

In *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), the Court of Appeals considered the application of *Danann* to a negotiated guarantee by sophisticated corporate officers of a multimillion dollar debt of the corporation. The guarantee recited that it was "absolute and unconditional" notwithstanding "(i) any lack of validity ... of the ... [guaranteed] Loan Agreement ... or any other agreement or instrument relating thereto" or "(vii) any other circumstances which might otherwise constitute a defense" to the guarantee. 66 N.Y.2d at 94, 495 N.Y.S.2d at 312, 485 N.E.2d at 977. Noting that *Danann* had been sharply criticized and that *Plapinger* did not involve "generalized boilerplate," the Court of Appeals held that the fraud defense had been waived:

> "Though not the explicit disclaimer present in *Danann*, the substance of defendants' guarantee forecloses their reliance on the claim that they were fraudulently inducted to sign the guarantee by the banks' oral promise of an additional line of credit. To permit that would in effect condone defendants' own fraud in 'deliberately misrepresenting [their] true intention' (*Danann Realty Corp. v. Harris*, 5 N.Y.2d at p 323, 184 N.Y.S.2d 599, 157 N.E.2d 597) when putting their signatures to their 'absolute and unconditional' guarantee." 66 N.Y.2d at 94, 495 N.Y.S.2d at 312, 485 N.E.2d at 977.

The pertinent language of the Notes in this case is quite similar to that of the guarantee held to have waived the fraudulent inducement defense in *Plapinger*:

| *The Notes in this Case* | *The Plapinger Guarantee* |
| --- | --- |
| "The payment obligations of the Company ... shall be unconditional and irrevocable and shall be paid strictly in accordance with the terms of this Note under all circumstances, including, without limitation, the following circumstances: | Guarantee "absolute and unconditional ... irrespective of |
| "(i) the existence of any claim, set-off defense or other right which the Company or any other person may have at any time against the Holder ..., or | "(i) any lack of validity ... of the ... Restated Loan Agreement ... or any other agreement or instrument relating thereto", or<br><br>* * * |
| "(ii) any other circumstances or happening whatsoever, whether or not similar to any of the foregoing." | "(vi) any other circumstances which might otherwise constitute a defense ..." |

Both made the obligation unconditional notwithstanding enumerated circumstances that otherwise would justify nonpayment—in this case, the existence of other claims, set-offs or other rights which the obligor might have

against the holder and, in *Plapinger*, the invalidity of the underlying agreement. Both made the obligation unconditional notwithstanding "any other circumstance," although the types of other circumstances referred to in the *Plapinger* guarantee were only those that "might otherwise constitute a defense" whereas the Notes here referred to other circumstances without limitation. But while there are minor differences in wording, the overall thrust of both documents is substantially the same. Just as in *Plapinger* and *Danann*, permitting Holdings to rely on a claim that it was fraudulently induced to execute the Notes "would in effect condone [Holdings'] own fraud in 'deliberately misrepresenting [its] true intention' [citation omitted] when putting [its] signature[ ] to" the Notes. *Plapinger*, 66 N.Y.2d at 94, 495 N.Y.S.2d at 312, 485 N.E.2d at 977.

*Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310 (2d Cir.1993), is entirely consistent with this view. While the guarantee there at issue was absolute and unconditional by its terms, it differed from the Notes at issue here in two critical respects. First, it was contained in a preprinted form that the Second Circuit characterized as "generalized boilerplate." *Id.* at 317. Second and, in the Court's view, more important, it did "not purport to waive defenses to its own validity." *Id.* As the Second Circuit put it, the guarantee:

> "contains no disclaimer as to the validity, regularity, or enforceability of the Guarantee itself. It also contains no disclaimer of the existence of or reliance upon representations by MHT, no express reference to any promise of continued financing, *and no blanket disclaimer of the type found in* Plapinger *as to 'any other circumstances which might otherwise constitute a defense' to the Guarantee.*" *Id.*

Here, on the other hand, the Notes were the product of negotiations among sophisticated businessmen that produced custom-crafted instruments. They disclaim the right to rely on *any* claim or other right against the holder, and they do contain a blanket disclaimer of the type found in *Plapinger*. In consequence, Holdings has waived any defense of fraud in the inducement.

### The Guarantees

█ The Guarantees present a different question. While they recite that they are absolute and unconditional, they contain nothing more. *Yanakas*, however, squarely holds that "the mere general recitation that a guarantee is 'absolute and unconditional' is insufficient under *Plapinger* to bar a defense of fraudulent inducement, and that the touchstone is specificity." 7 F.3d at 316. As the Guarantees contain nothing more, they do not alone preclude assertion of the fraudulent inducement defense.

Plaintiffs contend that "[t]he parties clearly intended the Guarantees to carry the same obligations as the Notes." (Pl.Reply Br. 8) They point out that Loeffelhardt and de Geus signed the Purchase Agreement and assert that "the Purchase Agreement contains the same language as do the Notes waiving all defenses to the payment obligations of Holdings ..." (*Id.*) But they overstate their case. The Purchase Agreement does indeed make "[t]he payment obligations of Buyer" unconditional, and the language of the Notes waives defenses. (de Geus Aff. Ex. D § 10.15) But "Buyer" is defined to mean Holdings. (*Id.* at 1) Moreover, in signing the Purchase Agreement, Loeffelhardt and de Geus merely "agree[d] to be bound by the provisions of this Agreement applicable to the Shareholders." (*Id.* at 44) Hence, there is nothing in the language of the Purchase Agreement to support plaintiffs' contention that the waiver of defenses contained in the Notes was incorporated also into the Guarantees.

### Waiver of the Fraud Defense

█ Plaintiffs have another argument, however. They contend that Holdings' waiver of any fraudulent inducement defense to the Notes precludes Loeffelhardt and de Geus from asserting that defense as well. They rely on *Walcutt v. Clevite Corp.*, 13 N.Y.2d 48, 241 N.Y.S.2d 834, 191 N.E.2d 894 (1963).

*Walcutt* involved a transaction in which Clevite Corporation contracted to sell assets previously acquired from the plaintiffs to defendant Richmond, who caused the formation of Walco Electronics Company to assume the

purchase obligation and guaranteed Walco's obligations, including the obligation to make certain payments due to the plaintiffs. When a dispute arose, plaintiffs sued both Clevite and Richmond, the latter of whom sought to defend on the ground that Clevite had defrauded him and Walco with respect to the inventory they acquired in the purchase transaction.

The plaintiffs sought summary judgment against Richmond, arguing in part that a guarantor, when sued alone by the creditor, may not avail him- or herself of an independent cause of action existing in favor of the principal as a defense or counterclaim. *See Ettlinger v. National Surety Co.*, 221 N.Y. 467, 469, 117 N.E. 945, 946 (1917); *Elliott v. Brady*, 192 N.Y. 221, 226, 85 N.E. 69, 71 (1908). The Court of Appeals, however, held that Richmond's defense, in substance, was that Walco had not received the bargained-for consideration and that Richmond, although sued alone, was entitled "to avail himself of the defense of a partial failure of consideration arising out of the main contract." 13 N.Y.2d at 55–56, 241 N.Y.S.2d at 838–39, 191 N.E.2d at 897. It did so for two reasons.

First, it distinguished *Ettlinger* and similar cases on the ground that a guarantor asserting the defense of failure of consideration "does not avail himself of an *independent* claim belonging to the principal nor does he arrogate to himself a right of election which his principal enjoys." 13 N.Y.2d at 56, 241 N.Y.S.2d at 838, 191 N.E.2d at 897 (emphasis added).

Second, it relied upon the fact that "Richmond and Walco are truly one and the same." 13 N.Y.2d at 56, 241 N.Y.S.2d at 839, 191 N.E.2d at 898. In consequence, any fraud practiced on Walco "must perforce have been committed on Richmond." *Id.*

*Walcutt* thus does not dispose of this case. Here, the record certainly raises at least a genuine issue as to whether de Geus and Loeffelhardt, on the one hand, and Holdings, on the other, were *alter egos*. In conse-

quence, *Walcutt* would permit assertion of the fraud defense by the guarantors unless Holdings' waiver of that defense is binding on them, an issue that *Walcutt* does not address. *See also* RESTATEMENT, SECURITY § 118 (1941) (surety not liable where principal induced by fraud to assume obligation).

There is significance also in *Walcutt*'s distinction of *Ettlinger* and similar cases on the ground that the latter involved independent claims of the principals. Here the claim is that the plaintiffs simultaneously defrauded both Holdings and the guarantors, the former to enter into the Purchase Agreement and the latter both to cause Holdings to do so and to execute the Guarantees. Thus, the defense the guarantors seek to assert here is not merely that their principal was defrauded, but that they were induced to give the Guarantees by fraud. As it is well established that "a creditor can not recover from a guarantor where the creditor has practiced any fraud to induce the guarantor to assume the obligation of guaranty," *General Motors Acceptance Corp. v. Kalkstein*, 101 A.D.2d 102, 105, 474 N.Y.S.2d 493, 495 (1st Dept. 1984), and as the Guarantees do not waive that defense, de Geus and Loeffelhardt may assert that defense in this case.

### Sufficiency of the Fraud Defense

■ The fact that de Geus and Loeffelhardt are entitled to raise a fraud defense to the claim on the guarantees does not mean that they have done so in a manner sufficient to defeat plaintiffs' motion for summary judgment. The starting point for consideration of that question is the standard governing the issue of summary judgment with respect to the guarantors' affirmative defense of fraud,[9] a defense on which it would bear the burden of proof at trial.

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court held that:

"[T]he plain language of Rule 56(c) mandates the entry of summary judgement, after adequate time for discovery and upon

---

9. The guarantors have characterized their position also as a defense of failure of consideration. As will appear, there is no distinction material here between the defense of fraudulent induce-

ment and partial failure of consideration because (i) *scienter* is not an element of the fraud defense and (ii) the alleged misrepresentation was as to the value of the assets purchased.

motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2549.

This language necessarily means that one who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense. Not surprisingly, cases decided since *Celotex Corp.* have so held. *E.g., Federal Deposit Insurance Corp. v. Giammettei*, 34 F.3d 51, 54–55 (2d Cir. 1994) (plaintiff's motion for summary judgment striking affirmative defense proper where evidence, viewed in light most favorable to the defendant, "reveals the absence of evidence supporting an essential element of the defense"); *Dollar Dry Dock Savings Bank v. Hudson Street Development Associates*, No. 92 Civ. 3737 (SAS), 1995 WL 412572, at *5 (S.D.N.Y. July 12, 1995) (burden is on defendant to adduce evidence supporting affirmative defense, not upon movant to negate its existence); *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F.Supp. 1076, 1090–91 (D.Del.1990), *aff'd*, 932 F.2d 959 (3d Cir.1991) (table); *Temple v. Federal Deposit Insurance Corp.*, No. SA–89–CA–569, 1990 WL 485316, at *2–*3 (W.D.Tex. May 17, 1990), *aff'd*, 988 F.2d 24 (5th Cir.1993); *Insurance Company of North America v. Misch*, No. 88–3669, 1989 WL 73702, at *3 (E.D.Pa.1989). Accordingly, the issue for decision is whether the guarantors' papers, viewed in the light most favorable to them, would permit the conclusion that they were defrauded or that they have some other legally sufficient affirmative defense to the action on the Guarantees.

■ The elements of fraud sufficient to render a contract voidable under New York law are a false representation of a material fact upon which the party seeking to avoid the contract justifiably relied to his detriment in entering into the agreement. *E.g., United States ex rel. Roman v. Schlesinger*, 404 F.Supp. 77, 85 (E.D.N.Y.1975). Notwith-

standing dicta to the contrary in a recent state court opinion, *scienter*, or intent to deceive, is not required unless the representation is one of opinion. *Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir.1976); *contra, First Nationwide Bank v. 965 Amsterdam, Inc.*, 212 A.D.2d 469, 470–71, 623 N.Y.S.2d 200, 201 (1st Dept.1995).

■ Here, the guarantors' papers adequately set out the materiality of the alleged misrepresentation, as the alleged $7.2 million overstatement is of sufficient magnitude, as well as the necessary detrimental reliance. The fundamental question is whether, viewing the evidence in the light most favorable to the guarantors, it is sufficient to permit the inference that there was such a misrepresentation in the first place.

■ Defendants' claim is set out in de Geus' two affidavits, the affidavit of Rob Goedkoop of Moret, and in a complaint in a related action which is incorporated therein by reference. (de Geus Reply Aff. ¶ 11 & Ex. 1; Goedkoop Aff. ¶¶ 3–4) Those documents indicate that the sole bases for the contention that the Balance Sheets prepared by Eisner overstated the value of the assets are the Moret reports and the Buyer's suspicions. (de Geus Aff. ¶¶ 16–29; de Geus Reply Aff. ¶¶ 3–11 & Ex. 1, ¶¶ 3–47, 66–85) Moreover, as the preceding discussion of the Moret reports demonstrates, this is not a case in which the Buyer has had the books reviewed by an expert who has concluded that the balance sheets tendered by the sellers were false or misleading. Rather, the Moret reports show quite clearly that Moret audited nothing and expressed no opinion as to anything material here. Indeed, there is no suggestion that Moret even looked at the books of account of the entities in question, principally the two Russian subsidiaries. Moret instead performed very limited reviews of calculations prepared by the Buyers—reviews "designed to be responsive to [the Buyers'] objectives"—and, in substance, said that the arithmetic and the exchange rates were correct. Thus, the substance of the Buyers' claim appears to boil down to the following: (1) the Buyers prepared a set of calculations which, on the Buyers' assump-

tions, show that the Buyers overpaid; (2) Moret checked the Buyers' math; and therefore (3) the Eisner-prepared balance sheets must have overstated the value of the assets because Eisner's figures do not agree with the Buyers'.

To be sure, Goedkoop's affidavit states that it appears to him that the so-called open items were not accounted for in the Final Cash Purchase Price, *i.e.*, the Closing Balance Sheet, and that the price otherwise would have been $7.2 million lower. (Goedkoop Aff. ¶ 3) The affidavit goes on to say, however, that Moret's findings as to the open items are set forth in the two Moret reports discussed above. (*Id.* ¶ 4) The affidavit thus makes clear that Goedkoop's pivotal assertion—that there was a $7.2 million overstatement—is based on the two reports which, for the reasons previously discussed, do not adequately support the contention. In consequence, even accepting the truth of his assertion that the open items were not accounted for, there is no legally sufficient basis for concluding that their inclusion would have made any material difference.

■ The only remaining issue is whether the entry of summary judgment against the guarantors is appropriate notwithstanding that there has been no discovery in this case. As defendants recognize, this is governed by FED.R.CIV.P. 56(f), which provides:

> "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

This Circuit adheres to a four-part test for determining the sufficiency of an affidavit requesting additional time to conduct discovery in order to respond to a summary judgment motion:

> "The affidavit must include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made to obtain those facts;

and why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994). *Accord, e.g., Hudson River Sloop Clearwater, Inc. v. Department of the Navy*, 891 F.2d 414, 422 (2d Cir.1989).

■ The evidence now before the Court is insufficient to raise a genuine issue of fact material to the claim that the Eisner balance sheets materially overstated the book value of the transferred assets, principally because the evidence is insufficient to permit the inference that properly prepared balance sheets as at September 30, 1993 would vary materially from those Eisner prepared. Hence, defendants' Rule 56(f) affidavit must be evaluated from the perspective of determining, *inter alia*, whether it establishes a reasonable expectation that the proposed discovery would yield evidence sufficient to permit such an inference.

Defendants' Rule 56(f) affidavit makes several assertions. First, it quite accurately notes that de Geus and Frankel have given different versions of the events concerning the execution of the Purchase Agreement and the payment of the Purchase Price, and it contends that "[o]nly discovery will allow the parties to develop an accurate version of events." (Scharf Reply Aff. ¶ 4) It then goes on to state that certain facts are peculiarly within plaintiffs' knowledge, specifically: "(i) plaintiffs' knowledge of the true value of ICD and (ii) the nature of plaintiffs' directions to Eisner and/or discussions between plaintiffs and Eisner." (*Id.* ¶ 5) In each case, however, discovery either would bear on a matter that could not cure the deficiency in defendants' opposition to the motion, pertain to information already available to defendants, or both.

To begin with, the development of an accurate version of the events surrounding the execution of the Purchase Agreement and the payment of the Purchase Price would not shed light on whether there is a material inaccuracy in the Eisner-prepared balance sheets. The question whether accounting for the open items would have yielded a materially different result does not turn on which side's version, if either, of the events con-

cerning the conclusion of the agreement is correct. It turns instead on whether the application of the accounting principles prescribed by the Purchase Agreement would have resulted in a materially different Purchase Price. That calls for a review of the relevant books and records by a qualified accountant. Yet there is no showing that defendants required discovery to conduct such an examination. Indeed, in view of the fact that the defendants bought the business, the books and records necessary to conduct that examination are within their control, not the plaintiffs'.[10] At any rate, defendants' Rule 56(f) affidavit does not claim otherwise.

The next of defendants' contentions is easily disposed of. Inasmuch as defendants long worked for, and for more than two years now have owned, this business, it is highly doubtful that "the true value of ICD" is uniquely within the knowledge of the plaintiffs. Far more important, however, is this: The true value of ICD, assuming there is any such thing, has little if anything to do with this case. This was a book value deal. Because generally accepted accounting principles typically require the use of historical cost rather than current value, there rarely is any necessary relationship between book and market values of assets or companies. *See, e.g.,* R.K. Maritz, *Basic Concepts of Accounting* in HANDBOOK OF MODERN ACCOUNTING 1–6 to 1–8 (Sidney Davidson ed., 1970). In consequence, defendants have failed to demonstrate either the materiality of information regarding "true value" or that they lack such information themselves.

Finally, defendants correctly point out that discovery would be required to find out what if anything transpired between plaintiffs and Eisner. However interesting defendants might find that information, it is not material here for reasons previously suggested. Inasmuch as *scienter* is not an element of the guarantors' defense, what went on between plaintiffs and Eisner simply does not matter. If Eisner did not properly prepare the balance sheet and it is materially wrong, the guarantors may avoid their Guarantees irrespective of whether the inaccuracy was the product of negligence or deliberate fraud.

On the other hand, if the balance sheet is not materially wrong, it does not matter how or why Eisner came to a substantially correct result—the Guarantors would have no defense. Indeed, this would be true even if the contract required the inclusion of the open items in the balance sheet and even if Eisner erroneously omitted them; as long as the bottom line was not materially wrong, the guarantors would have no defense.

As the Guarantors have not demonstrated that any of the subjects on which they propose to conduct discovery is reasonably likely to yield evidence that promises to overcome their failure to raise a genuine issue of fact as to the substantial accuracy of the balance sheets, the application for relief under Rule 56(f) must be denied.

### Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment is granted in all respects. The cross-motion of defendants de Geus and Loeffelhardt to dismiss the action as to them for lack of jurisdiction over their persons is denied.

This disposes of all claims against all defendants except ICD Group, B.V., which is in bankruptcy. To defer entry of a final judgment until the matter can be resolved as against B.V. would impose an unjust and unreasonable burden on all other parties. Plaintiffs would be deprived of the benefit of their bargain. The remaining defendants would be subjected to the burdens that come with having an adjudication that they owe more than $5 million without having an opportunity to appeal promptly from that determination. Accordingly, there is no just reason for delay, and the Clerk should enter judgment for plaintiff Frankel against Holdings, de Geus and Loeffelhardt in the amount $789,701.10 and for plaintiff Leviant against said defendants in the amount of $4,342,-635.90, in each case plus interest from January 1, 1996 and costs.

SO ORDERED.

---

**10.** As a result of the acquisition, AOZT Versus and Hisparus became 100 percent and 70 per-

cent owned indirect subsidiaries, respectively, of Holdings. (De Geus Aff. Ex. B)