15-3885(L)
Fox News Network, LLC v. TVEyes, Inc.

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: March 7, 2017     Decided: February 27, 2018)

Docket Nos. 15-3885(L), 15-3886(XAP)

- - - - - - - - - - - - - - - - - - -x

FOX NEWS NETWORK, LLC,

Plaintiff-Appellee-Cross-Appellant,

- v.-

TVEYES, INC.,

Defendant-Appellant-Cross-Appellee.

- - - - - - - - - - - - - - - - - - -x

Before:     NEWMAN, JACOBS, Circuit Judges, and KAPLAN, District Judge.*

---

\* Judge Lewis A. Kaplan, United States District Court for the Southern District of New York, sitting by designation.

Defendant TVEyes, Inc. ("TVEyes") is a media company that continuously records the audiovisual content of more than 1,400 television and radio channels, imports that content into a database, and enables its clients, for $500 per month, to view, archive, download, and email to others ten-minute clips.   TVEyes also copies the closed-captioned text of the content it imports, allowing its clients to search for the clips that they want by keyword, as well as by date and time.

Plaintiff Fox News Network, LLC ("Fox") sued TVEyes for copyright infringement in the United States District Court for the Southern District of New York.   The principal question on appeal is whether TVEyes's enabling of its clients to watch Fox's programming is protected by the fair use doctrine.

TVEyes's re-distribution of Fox's content serves a transformative purpose insofar as it enables TVEyes's clients to isolate from the vast corpus of Fox's content the material that is responsive to their interests, and to access that material in a convenient manner.   But because that re-distribution makes available to TVEyes's clients virtually all of Fox's copyrighted content that the clients wish to see and hear, and because it deprives Fox of revenue that properly belongs to the copyright holder, TVEyes has failed to show that the product it offers to its clients can be justified as a fair use.

Accordingly, we reverse the order of the district court to the extent that it found fair use.   Our holding does not encompass the copying of Fox's closed-captioned text into a text-searchable database, which Fox does not challenge on appeal.   We affirm the district court's order to the extent that it denied TVEyes's request for additional relief.   We also remand for entry of a revised injunction.

Judge Kaplan concurs in a separate opinion.

<div style="margin-left:40%">

KATHLEEN M. SULLIVAN (Thomas C. Rubin, Todd Anten, and Jessica A. Rose on the brief), Quinn Emanuel Urquhart & Sullivan, LLP,   New York, NY, for Defendant-Appellant-Cross-Appellee TVEyes, Inc.

</div>

DALE M. CENDALI (Joshua L. Simmons on the brief), Kirkland & Ellis LLP, New York, NY, for Plaintiff-Appellee-Cross-Appellant Fox News Network, LLC.

Brian M. Willen (Lauren Gallo White and Stephen N. Gikow on the brief), Wilson Sonsini Goodrich & Rosati, P.C., New York, NY, for amicus curiae Google, Inc.

Brianna L. Schofield (Law Students Tomasz Barczyk and J. William Binkley on the brief), Samuelson Law, Technology & Public Policy Clinic, UC Berkeley School of Law, Berkeley, CA;** Lila Bailey, Law Office of Lila Bailey, San Francisco, CA, for amici curiae Internet Archive; American Library Association; Association of College and Research Libraries; Association of Research Libraries; Society of American Archivists, in support of TVEyes, Inc.

Corynne McSherry (Kit Walsh on the brief), Electronic Frontier Foundation, San Francisco, CA; Aaron Williamson, Technology Law & Policy Clinic, N.Y.U. School of Law, New York, NY, for amici curiae Electronic Frontier Foundation; Public Knowledge, in support of TVEyes, Inc.

---

** All law students appearing for amici do so pursuant to Local Rule 46.1(e).

Matt Schruers (Ali Sternburg on the brief), Computer & Communications Industry Association, Washington, DC; Jonathan Band, Jonathan Band PLLC, Washington, DC, for amicus curiae Computer & Communications Industry Association, in support of TVEyes, Inc.

Phillip R. Malone (Jeffrey T. Pearlman and Law Student Brian P. Quinn on the brief), Juelsgaard Intellectual Property and Innovation Clinic, Mills Legal Clinic at Stanford Law School, Stanford, CA, for amici curiae Media Critics, in support of TVEyes, Inc.

Rebecca Tushnet, Washington, DC; Michael Scott Leavy, Maplewood, NJ; Christopher Jon Sprigman, New York, NY, for amici curiae Professors of Intellectual Property Law, in support of TVEyes, Inc.

Rick Kaplan (Benjamin F.P. Ivins on the brief), National Association of Broadcasters, Washington, DC; Joseph R. Palmore (Paul Goldstein and James R. Sigel on the brief), Morrison & Foerster LLP, Washington, DC, for amicus curiae National Association of Broadcasters, in support of Fox News Network, LLC.

Barry I. Slotnick (Jonathan N. Strauss on the brief), Loeb & Loeb LLP, New York, NY, for amicus curiae Copyright Alliance, in support of Fox News Network, LLC.

4

Eleanor M. Lackman (Nancy E. Wolff, Scott J. Sholder, and Brittany L. Kaplan on the brief), Cowan DeBaets Abrahams & Sheppard LLP, New York, NY, for amici curiae American Photographic Artists; American Society of Media Photographers, Digital Media Licensing Association, National Press Photographers Association; Professional Photographers of America, in support of Fox News Network, LLC.

David L. Leichtman (Sherli Furst on the brief), Robins Kaplan LLP, New York, NY, for amici curiae American Society of Journalists and Authors, Inc.; Jonathan Taplin; Mary T. Rogus; Joe Bergantino; David C. Hazinski; Mitchell T. Bard; Patrick Meirick, in support of Fox News Network, LLC.

Michael S. Schooler, National Cable & Telecommunications Association, Washington, DC, for amicus curiae National Cable & Telecommunications Association, in support of Fox News Network, LLC.

Linda Steinman (Elizabeth A. McNamara and Alison Schary on the brief), Davis Wright Tremaine LLP, New York, NY, for amici curiae Cable News Network, Inc.; Gray Television Group, Inc.; Hearst Television, Inc.; ITV America, in support of Fox News Network, LLC.

Sandra Aistars, Arts and Entertainment Advocacy Clinic, George Mason University

5

School of Law, Arlington, VA; Jennifer Allen Sands Atkins, Cloudigy Law PLLC, McLean, VA, for amici curiae Intellectual Property Scholars, in support of Fox News Network, LLC.

JACOBS, Circuit Judge:

In this copyright infringement suit, defendant TVEyes, Inc. ("TVEyes") offers a service that enables its clients to easily locate and view segments of televised video programming that are responsive to the clients' interests. It does so by continuously recording vast quantities of television programming, compiling the recorded broadcasts into a database that is text-searchable (based primarily on the closed-captioned text copied from the broadcasts), and allowing its clients to search for and watch (up to) ten-minute video clips that mention terms of interest to the clients.[1] Plaintiff Fox News Network, LLC ("Fox"), which has sued TVEyes in the United States District Court for the Southern District of New York, does not challenge the creation of the text-searchable database but alleges that TVEyes infringed Fox's copyrights by re-distributing Fox's copied audiovisual content, thereby enabling TVEyes's clients to access that content without Fox's permission. The principal question on appeal is whether TVEyes's enabling of its clients to watch Fox's programming is protected by the doctrine of fair use. See 17 U.S.C. § 107.

The district court held that fewer than all of the functions of TVEyes's service constitute a fair use. Specifically, the district court deemed a fair use the functions enabling clients of TVEyes to search for videos by term, to watch the resulting videos, and to archive the videos on the TVEyes servers; but the court held that certain other functions were not a fair use, such as those enabling TVEyes's clients to download videos to their computers, to freely e-mail videos to others, or to watch videos after searching for them by date, time, and channel (rather than by keyword). The district court therefore dismissed Fox's challenge to important functions of TVEyes's service, but also held that TVEyes was liable to

---

[1] TVEyes also captures radio content. For simplicity, this opinion will focus on only television broadcasts.

Fox for copyright infringement on account of other functions of that service.   A permanent injunction limited various aspects of TVEyes's service.[2]

This appeal shares features with our decision in Authors Guild v. Google, Inc., 804 F.3d 202 (2d Cir. 2015) ("Google Books").   That case held that Google's creation of a text-searchable database of millions of books (including books under copyright) was a fair use because Google's service was "transformative" and because integral features protected the rights of copyright holders.   However, we cautioned that the case "test[ed] the boundaries of fair use."   Google Books, 804 F.3d at 206.   We conclude that defendant TVEyes has exceeded those bounds.

TVEyes's re-distribution of Fox's audiovisual content serves a transformative purpose in that it enables TVEyes's clients to isolate from the vast corpus of Fox's content the material that is responsive to their interests, and to access that material in a convenient manner.   But because that re-distribution makes available virtually all of Fox's copyrighted audiovisual content--including all of the Fox content that TVEyes's clients wish to see and hear--and because it deprives Fox of revenue that properly belongs to the copyright holder, TVEyes has failed to show that the product it offers to its clients can be justified as a fair use.

Accordingly, we reverse the order of the district court to the extent it held that some of the challenged TVEyes functions constituted a fair use.   We affirm the order to the extent that it denied TVEyes's request for additional relief.   Furthermore, because the district court's issuance of an injunction was premised on the incorrect conclusion that much of what TVEyes offered was a fair use, we remand for the district court to revise the injunction in light of this opinion.

**I**

TVEyes is a for-profit media company.   It offers a service that allows its clients to efficiently sort through vast quantities of television content in order to find clips that discuss items of interest to them.   For example, a client in

---

[2] Fox does not challenge on appeal the dismissal (on summary judgment) of its claims alleging "hot news" misappropriation and "direct competition" misappropriation.

marketing or public relations interested in how a particular product is faring in the media can use the TVEyes service to find, watch, and share clips of recent television broadcasts that mention that product.

The service works this way. TVEyes records essentially all television broadcasts as they happen, drawing from more than 1,400 channels, recording 24 hours a day, every day. By copying the closed-captioned text that accompanies the content it records (and utilizing speech-to-text software when necessary), TVEyes creates a text-searchable transcript of the words spoken in each video. The videos and transcripts are consolidated into a database. A client inputs a search term and gets a list of video clips that mention the term. A click on a thumbnail image of a clip plays the video, beginning fourteen seconds before the search term was spoken, and displays a segment of the transcript with the search term highlighted. The parties dispute the quality of the clips. Fox contends that the clips are high definition; TVEyes contends that the clips are grainier than the original broadcasts. The clips can be played for no more than ten minutes, but a user can play an unlimited number of clips. To prevent clients from watching entire programs, TVEyes (during the course of this litigation) implemented a device that is claimed to prevent clients from viewing consecutive segments. The parties dispute whether this measure is effective.

TVEyes's service has ancillary functions. A TVEyes client may "archive" videos permanently on the TVEyes servers and may download videos directly to the client's computer. These services are useful because TVEyes otherwise deletes captured content after thirty-two days. Clients can also email the clips for viewing by others, including those who are not TVEyes clients. And clients can search for videos by date, time, and channel (rather than by keyword). The parties dispute whether clients can watch live broadcasts on TVEyes.

A TVEyes subscription costs approximately $500 per month, is available for business and professional use, and is not offered to private consumers for personal use. Clients include journalists, government and political organizations, law enforcement, the military, for-profit companies, and non-profits.

TVEyes asserts that it restricts its clients' use of its content in various ways. For example, clients are required to sign a contract that limits their use of clips to

"internal purposes only" and are warned upon downloading a clip that it is to be used for only "internal review, analysis or research." Fox contends that these safeguards are ineffective and disputes the assertion by TVEyes that its service is primarily used for "internal" research and analysis.

Fox claims that at some point TVEyes unsuccessfully approached it to procure a license to use Fox programming. Fox demanded that TVEyes stop using its programming; when TVEyes refused, litigation ensued. The lawsuit focuses on nineteen copyrighted Fox broadcasts. The legal question is whether TVEyes has a "fair use" defense to Fox's copyright infringement claims. 17 U.S.C. § 107.

## II

The Copyright Act provides:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include--
>
> (1)    the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2)    the nature of the copyrighted work;
>
> (3)    the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4)    the effect of the use upon the potential market for or value of the copyrighted work.

9

<u>Id</u>.

In fair use litigation, courts undertake a "case-by-case analysis" in which each factor is considered, "and the results [are] weighed together, in light of the purposes of copyright." <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 577-78 (1994). The factors are non-exclusive, but consideration of each is mandatory.[3] <u>Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.</u>, 756 F.3d 73, 81 (2d Cir. 2014). Some of the factors are more important than others, with the fourth (market impact) being "the single most important element." <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 566 (1985). Fair use is an affirmative defense, so TVEyes bears the burden of proving it. <u>Am. Geophysical Union v. Texaco, Inc.</u>, 60 F.3d 913, 918 (2d Cir. 1994).

It is useful to analyze separately distinct functions of the secondary use (i.e., the use by TVEyes of Fox's copyrighted material), considering whether each independent function is a fair use. <u>See</u> <u>Google Books</u>, 804 F.3d at 216-18. TVEyes has two core offerings: the "Search function" and the "Watch function." The Search function allows clients to *identify* videos that contain keywords of interest. The Watch function allows TVEyes clients to *view* up to ten-minute, unaltered video clips of copyrighted content. Fox does not challenge the Search function on appeal. Fox's challenge is to the Watch function, and we determine that its inclusion renders TVEyes's package of services unprotected by the fair use doctrine. That conclusion subsumes and obviates consideration of certain functions that are subsidiary to the Watch function, such as archiving, downloading, and emailing the video clips.

Turning to the Watch function, we next consider each of the four factors listed in § 107.

---

[3] *Pace* Judge Kaplan's argument that our discussion of transformative use (which is integral to the first statutory factor) should be omitted from the fair-use analysis--or be deemed dicta. Whether the majority opinion's discussion "may contribute to confusion and uncertainty" (Concurring Op. at 3) is not for me to say.

**A**

In considering the first statutory factor--the "purpose and character" of the secondary use, 17 U.S.C. § 107(1)--the primary inquiry is whether the use "communicates something new and different from the original or [otherwise] expands its utility," that is, whether the use is "transformative." Google Books, 804 F.3d at 214. To be transformative, a use must "do[] something more than repackage or republish the original copyrighted work"; it must "'add[] something new, with a further purpose or different character, altering the first with new expression, meaning or message . . . .'" Authors Guild, Inc. v. HathiTrust, 755 F.3d 87, 96 (2d Cir. 2014) (quoting Campbell, 510 U.S. at 579). "Although . . . transformative use is not absolutely necessary for a finding of fair use, . . . [transformative] works . . . lie at the heart of the fair use doctrine," Campbell, 510 U.S. at 579, and "a use of copyrighted material that 'merely repackages or republishes the original' is unlikely to be deemed a fair use," Infinity Broad. Corp. v. Kirkwood, 150 F.3d 104, 108 (2d Cir. 1998) (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990)).

Precedent is helpful. Both parties rely most heavily on Google Books, which provides the starting point for analysis.

In Google Books, a consortium of libraries collaborated to make digital copies of millions of books, many of them under copyright. Google pooled these digital copies into a text-searchable database. 804 F.3d at 207. Anyone could search the database free. When a user entered a search term, Google returned a list of books that included the term, and, for each responsive book, Google provided a few "snippets" that contained the term. Id.

We held that Google's copying served a transformative purpose because it created a text-searchable database that "communicate[d] something new and different from the original." Id. at 214. "[T]he result of a word search is different in purpose, character, expression, meaning, and message from the page (and the book) from which it is drawn." Id. at 217 (quoting HathiTrust, 755 F.3d at 97).

11

We also held that the "snippet view" of unaltered, copyrighted text "add[ed] important value to the basic transformative search function" by allowing users to verify that the list of books returned by the database was responsive to the user's search.   Id.   Thus, a user searching for the term "Hindenburg" could infer from snippets whether the book was referencing the Weimar president or the exploded zeppelin.   See id. at 217-18.

TVEyes's copying of Fox's content for use in the Watch function is similarly transformative insofar as it enables users to isolate, from an ocean of programming, material that is responsive to their interests and needs, and to access that material with targeted precision.   It enables nearly instant access to a subset of material--and to information about the material--that would otherwise be irretrievable, or else retrievable only through prohibitively inconvenient or inefficient means.

Sony Corporation of America vs. Universal City Studios, Inc. is instructive. See 464 U.S. 417 (1984).   In Sony, a television customer, who (by virtue of owning a television set) had acquired authorization to watch a program when it was broadcast, recorded it in order to watch it instead at a later, more convenient time. That was held to be a fair use.   While Sony was decided before "transformative" became a term of art, the apparent reasoning was that a secondary use may be a fair use if it utilizes technology to achieve the transformative purpose of improving the efficiency of delivering content without unreasonably encroaching on the commercial entitlements of the rights holder.

The Watch function certainly qualifies as technology that achieves the transformative purpose of enhancing efficiency: it enables TVEyes's clients to view all of the Fox programming that (over the prior thirty-two days) discussed a particular topic of interest to them, without having to monitor thirty-two days of programming in order to catch each relevant discussion; and it eliminates the clients' need even to view entire programs, because the ten most relevant minutes are presented to them.   Much like the television customer in Sony, TVEyes clients can view the Fox programming they want at a time and place that is convenient to

12

them, rather than at the time and place of broadcast.   For these reasons, TVEyes's Watch function is at least somewhat transformative.[4]

<center>*     *     *</center>

The first statutory factor also implicates considerations distinct from whether the secondary use is transformative.   In particular, Fox argues that the "commercial nature" of TVEyes's copying (its sale of access to Fox's content) weighs against a finding of fair use.   17 U.S.C. § 107(1).

The commercial nature of a secondary use weighs against a finding of fair use.   See Campbell, 510 U.S. at 585.   And it does so especially when, as here, the transformative character of the secondary use is modest.   See id. at 579 ("[T]he [less] transformative the new work, the [more] will be the significance of other factors, like commercialism . . . .").   The Watch function has only a modest transformative character because, notwithstanding the transformative manner in which it delivers content, it essentially republishes that content unaltered from its original form, with no "new expression, meaning or message."   HathiTrust, 755 F.3d at 96 (quoting Campbell, 510 U.S. at 579); cf. Kirkwood, 150 F.3d at 106 (service that transmits unaltered radio broadcasts in real time over telephone lines is not transformative); Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 342

---

[4] TVEyes argues that the Watch function is transformative because it allows clients to conduct research and analysis of television content by enabling them to view clips responsive to their research needs.   Research, TVEyes argues, is a purpose not shared by users of the original content.   This argument proves too much.

That a secondary use can facilitate research does not itself support a finding that the secondary use is transformative.   See American Geophysical Union v. Texaco, Inc., 60 F.3d 913 (2d Cir. 1994).   In Texaco, a company was allowing each of its 400 to 500 scientists to photocopy journal articles pertinent to their individual research projects, thus enabling three subscriptions to service the needs of hundreds of scientists.   Id. at 915-16.   We stated that if copying were deemed transformative "simply because [it was done] in the course of doing research," then "the concept of a 'transformative' use would be extended beyond recognition."   Id. at 924.

<center>13</center>

F.3d 191, 199-200 (3d Cir. 2003) (service that streams short previews of movies without commentary is not transformative). The clients of TVEyes use Fox's news broadcasts for the same purpose that authorized Fox viewers use those broadcasts--the purpose of learning the information reported.

The first statutory factor therefore favors TVEyes, albeit slightly.

**B**

The second statutory factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "has rarely played a significant role in the determination of a fair use dispute," and it plays no significant role here. Google Books, 804 F.3d at 220.

TVEyes presses the argument that, since facts are not copyrightable, the factual nature of Fox's content militates in favor of a finding of fair use. We have rejected this argument: "Those who report the news undoubtedly create factual works. It cannot seriously be argued that, for that reason, others may freely copy and re-disseminate news reports." Id. at 220.

**C**

The third statutory factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The relevant consideration is the amount of copyrighted material *made available to the public* rather than the amount of material *used by the copier*. Google Books, 804 F.3d at 222.

This factor clearly favors Fox because TVEyes makes available virtually the entirety of the Fox programming that TVEyes users want to see and hear. While "courts have rejected any categorical rule that a copying of the entirety cannot be a fair use," "a finding of fair use is [less] likely . . . when the copying is extensive, or encompasses the most important parts of the original." Id. at 221. In this respect, the TVEyes Watch function is radically dissimilar to the service at issue in Google Books.

14

Google's snippet function was designed to ensure that users could see only a very small piece of a book's contents. Each snippet was three lines of text, constituting approximately one-eighth of a page; a viewer could see at most three snippets per book for any searched term, and no more than one per page. Users were prevented from performing repeated searches to find multiple snippets that could be compiled into a coherent block of text. Approximately 22% of a book's text was "blacklist[ed]": no snippet could be shown from those pages. Id. at 222. And snippets were not available at all for such books as dictionaries or cookbooks, in which a snippet might convey all the information that a searcher was likely to need. While the snippets allowed a user to judge whether a book was responsive to the user's needs, they were abbreviated to ensure that it would be nearly impossible for a user to see a meaningful exposition of what the author originally intended to convey to readers.

TVEyes redistributes Fox's news programming in ten-minute clips, which--given the brevity of the average news segment on a particular topic--likely provide TVEyes's users with all of the Fox programming that they seek and the entirety of the message conveyed by Fox to authorized viewers of the original. Cf. Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 564-65 (1985) (finding no fair use when the copying involved only about 300 words, but the portion copied was "the heart of the book"). TVEyes's use of Fox's content is therefore both "extensive" and inclusive of all that is "important" from the copyrighted work. Google Books, 804 F.3d at 221.

**D**

The fourth statutory factor is "the effect of the [secondary] use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor is "undoubtedly the single most important element of fair use." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 566 (1985). It "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." Google Books, 804 F.3d at 223. Critically, it requires consideration of "not only the . . . market harm caused by the particular actions of the alleged infringer," but also the market harm that would result from

15

"unrestricted and widespread conduct of the [same] sort."   Campbell, 510 U.S. at 590 (internal quotation marks and alteration omitted).

TVEyes argues that its service poses little risk of being a "competing substitute" for Fox's offerings.   Google Books, 804 F.3d at 223.   Fox argues that TVEyes undercuts Fox's ability to profit from licensing searchable access to its copyrighted content to third parties.   Fox has much the stronger point.

"It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor."   Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 614 (2d Cir. 2006) (quoting Texaco, 60 F.3d at 929).   However, "not every effect on potential licensing revenues enters the analysis under the fourth factor."   Texaco, 60 F.3d at 929.   A copyright owner has no right to demand that users take a license unless the use that would be made is one that would otherwise infringe an exclusive right.   See Bill Graham Archives, 448 F.3d at 615.   Even if a use does infringe an exclusive right, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work."   Texaco, 60 F.3d at 930 (internal quotation marks omitted).

That limitation does not restrict our analysis here.   The success of the TVEyes business model demonstrates that deep-pocketed consumers are willing to pay well for a service that allows them to search for and view selected television clips, and that this market is worth millions of dollars in the aggregate. Consequently, there is a plausibly exploitable market for such access to televised content, and it is proper to consider whether TVEyes displaces potential Fox revenues when TVEyes allows its clients to watch Fox's copyrighted content without Fox's permission.

Such displacement does occur.   Since the ability to re-distribute Fox's content in the manner that TVEyes does is clearly of value to TVEyes, it (or a similar service) should be willing to pay Fox for the right to offer the content.   By providing Fox's content to TVEyes clients *without* payment to Fox, TVEyes is in

16

effect depriving Fox of licensing revenues from TVEyes or from similar entities. And Fox itself might wish to exploit the market for such a service rather than license it to others. TVEyes has thus "usurp[ed] a market that properly belongs to the copyright-holder." Kirkwood, 150 F.3d at 110. It is of no moment that TVEyes allegedly approached Fox for a license but was rebuffed: the failure to strike a deal satisfactory to both parties does not give TVEyes the right to copy Fox's copyrighted material without payment.

In short, by selling access to Fox's audiovisual content without a license, TVEyes deprives Fox of revenues to which Fox is entitled as the copyright holder. Therefore, the fourth factor favors Fox.

<center>E</center>

To ascertain whether TVEyes's service is protected as a fair use, the final step is to weigh the four statutory factors together, along with any other relevant considerations. The factors should not be "treated in isolation, one from another"; rather, "[a]ll are to be explored, and the results [are to be] weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 577-78. While the factors are not exclusive, in this case they provide sufficient guidance. See Kirkwood, 150 F.3d at 111.

We conclude that TVEyes's service is not justifiable as a fair use. As to the first factor, TVEyes's Watch function is at least somewhat transformative in that it renders convenient and efficient access to a subset of content; however, because the function does little if anything to change the content itself or the purpose for which the content is used, its transformative character is modest at best. Accordingly--and because the service at issue is commercial--the first factor favors TVEyes only slightly. The second factor is neutral in this case. The third factor strongly favors Fox because the Watch function allows TVEyes's clients to see and hear virtually all of the Fox programming that they wish. And the fourth factor favors Fox as well because TVEyes has usurped a function for which Fox is entitled to demand compensation under a licensing agreement.

At bottom, TVEyes is unlawfully profiting off the work of others by commercially re-distributing all of that work that a viewer wishes to use, without

<center>17</center>

payment or license.   Having weighed the required factors, we conclude that the balance strongly favors Fox and defeats the defense of fair use.

### III

TVEyes challenges the district court's conclusion that it is liable to Fox under a theory of *direct* copyright infringement.[5]   A direct infringer exercises "volitional conduct" to make the infringing copy.   Cartoon Network LP, LLLP v. CSC Holdings, Inc. ("Cablevision"), 536 F.3d 121, 131 (2d Cir. 2008).   The conduct at issue in Cablevision was *non-volitional;* however, it bears no resemblance to what TVEyes does.   The Cablevision defendant provided a remote DVR service similar to the recording capability of a DVR in a television viewer's home.   Unless the *subscriber* chose to record a program, it remained on the defendant's server for no more than .1 second.   See id. at 124-25.   By contrast, *TVEyes* decides what audiovisual content to record, copies that content, and retains it for thirty-two days.   And this copying, at least to the extent that it is done to enable the Watch function, is an infringement.   Volitional conduct that infringes is clear.

### IV

The district court issued a permanent injunction prohibiting TVEyes from enabling its clients to download clips of Fox's programming or to search for such clips by date and time; the court also imposed restrictions on TVEyes's enabling of its clients to email clips or to post them to social media sites.   We review the issuance of a permanent injunction "for abuse of discretion, which may be found where the Court, in issuing the injunction, relied on . . . an error of law."   S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 237 (2d Cir. 2001) (quoting Knox v. Salinas, 193 F.3d 123, 128-29 (2d Cir. 1999) (per curiam)).

---

[5] A party that has not committed direct copyright infringement may still be liable under the doctrine of contributory infringement, which allows a defendant to be held liable for infringing acts of third parties.   See Sony, 464 U.S. at 435; Arista Records, LLC v. Doe 3, 604 F.3d 110, 117-18 (2d Cir. 2010).   Fox asserted liability only on the ground of direct infringement, so we do not consider contributory infringement.

The district court's injunction was shaped by an error of law: the mistaken assumption that the Watch function (and some features subsidiary to it) had fair-use protection. We therefore remand to the district court to revise the injunction in accordance with this opinion.

Because the product TVEyes currently offers includes the infringing Watch function and its subsidiary features (i.e., clients' ability to archive, download, and email clips, as well as to view clips after conducting a date/time search[6]), the court should enjoin TVEyes from offering that product. However, because Fox does not dispute TVEyes's right to offer its Search function, the court's injunction shall not bar TVEyes from offering a product that includes that function without making impermissible use of any protected audiovisual content.[7]

## CONCLUSION

The order of the district court is reversed to the extent it held that TVEyes's product was a fair use. The order is affirmed to the extent it denied TVEyes's request for additional relief. We remand for the district court to revise the injunction to conform with this opinion. Any further appeal will be assigned to this panel.

---

[6] There is no copyright infringement in the use of the date/time search function to discover the particular program that was playing on a certain channel at a certain time. That information is a historical fact, which is not copyrightable. See Arica Institute, Inc. v. Palmer, 970 F.2d 1067, 1075 (2d Cir. 1992). However, enabling a client to *view* a copied video located on the basis of a date/time search can constitute infringement, and it is not a fair use.

[7] Because Fox has not challenged the Search function on this appeal, and the parties have therefore presented no arguments about it, we express no views on it, neither upholding nor rejecting it.

19

KAPLAN, District Judge,[*] concurring:

I concur in the result as well as part I, the preamble to part II, and parts II.B, III and IV of the majority opinion. With great respect for my learned and distinguished colleagues, however, I do not join in their characterization of TVEyes' Watch function as "somewhat transformative." I decline for two reasons.

First, although the majority writes that it "is at least somewhat transformative," it holds that the Watch function nevertheless is not a fair use of Fox's copyrighted material. Stated differently, it holds that the other factors relevant to the fair use determination carry the day in favor of Fox regardless of whether the Watch function is or is not transformative. The "somewhat transformative" characterization therefore is entirely immaterial to the resolution of this case – in a familiar phrase, it is *obitur dictum*.[1] I would avoid any such characterization even if I agreed with it.

Second, while I prefer not to state a view as to whether the Watch function is transformative, I would be remiss, given the majority's opinion, if I did not express my doubt that the majority's view is correct. To the contrary, were we compelled to reach the point, I would be inclined to conclude that it is not.

*I*

I do not suggest that this or any appellate court should "purge dictum from [its] opinions."[2] But there are situations in which sound prudential reasons counsel against making statements that are "superfluous to the court's performance of its function."[3] I submit that this is one of them.

**1.** "[T]he goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at

---

[*] Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

[1] Contrary to the majority's suggestion, we are not obliged to reach a definitive decision as to each of the fair use factors in order to decide the fair use issue. *Henley v. Devore,* 733 F. Supp.2d 1144, 1155 (C.D. Cal. 2010) (assuming but not deciding that secondary use was transformative, but nevertheless rejecting fair use defense).

[2] Pierre N. Leval *Judging Under the Constitution: Dicta About Dicta,* 81 N.Y.U. L. REV. 1249, 1282 (2006) (hereinafter "*Dicta*").

[3] *Id.* at 1257.

the heart of the fair use doctrine[]."[4] "[T]he more transformative the new work, the less will be the significance of other factors."[5] It therefore is not at all surprising that attempts by alleged infringers to characterize their uses of copyrighted works as "transformative" have become a key battleground in copyright litigation, particularly as technological advances provide ever-new contexts in which the uncompensated use of copyrighted works is very attractive. And the law governing such controversies often is far from clear. As noted commentators have observed, courts "appear to label a use 'not transformative' as a shorthand for 'not fair,' and correlatively 'transformative' for 'fair.' Such a strategy empties the term of meaning."[6] Indeed, as will appear, some of our own decisions on the issue are at least in tension with one another.[7]

In these circumstances, a finding of transformative use, while "not absolutely necessary for a finding of fair use,"[8] is "of crucial importance to the fair use analysis."[9] And as the issue of fair use, in the words of a distinguished panel of this Court that remain apt despite intervening years, is "the most troublesome in the whole law of copyright," it is one that "ought not to be resolved in cases where it may turn out to be moot, unless the advantage is very plain."[10] The majority's unnecessary characterization of the Watch function as "somewhat transformative" has no "advantage," let alone one that is "very plain." Indeed, I fear it may contribute to confusion and uncertainty regarding this central concept in the law of fair use. Moreover, it threatens to do so in circumstances in which there is no realistic possibility of further appellate review.[11] The determination of the transformative use issue should be left for a case in which the question necessarily is presented.

---

[4]

*Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579 (1994).

[5]

*Id.*

[6]

4 MELVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT § 13.05, at 13-169 (2017).

[7]

*See id.* at 13-170.

[8]

*Id.* at 13-166.

[9]

*Id.* at 13-166 to 167.

[10]

*Deller v. Samuel Goldwyn, Inc.,* 104 F.2d 661, 662 (2d Cir. 1939) (per curiam) (L. Hand, A. Hand, Patterson, JJ).

[11]

*Dicta*, 81 N.Y.U. L. Rev. at 1262.

**2.** The advisability of expressing a view as to whether the Watch function is "transformative" is diminished further because this case passes judgment on a technological innovation. New efficiency-enhancing content delivery technologies that will seek to distribute copyrighted material owned by others doubtless now or soon will exist. Indeed, the efficiency enhancement that the Watch function allegedly provides appears to be, or to have become at least partly, available from Internet-based television subscription services to which Fox News presumably licenses its content.[12] Given (a) the rapid pace of technological change, (b) the importance of the concept of transformative purpose in fair use jurisprudence, and (c) the fact that it is unnecessary to address the question in this case, I respectfully disagree with the majority's decision to express a view as to whether the Watch function is transformative.

---

[12]

I understand that Internet-based cable subscription services now available allow a subscriber to record cable shows, store (some with limits on the amount that can be stored, some without), and re-watch those shows within a certain time frame (for example, within nine months of the recording). *See* Eric Liston, *How to Watch Fox News Without Cable – Your Top 5 Options*, FLIXED (Dec. 6, 2017), https://flixed.io/watch-fox-news-without-cable/. Someone who wanted to "monitor" Fox News could DVR (i.e., direct video record) all Fox News shows using these paid services. Upon using TVEyes's Search function – the transformative nature of which was not challenged – to identify when a term was said in a broadcast, the user could click directly to that portion of the broadcast and watch it immediately online using their paid subscription service. It is unclear whether these services as they currently exist would allow a user to monitor all local broadcasts throughout the country, but they certainly diminish the Watch function's convenience value.

And technology will march on, perhaps soon eliminating altogether the efficiency the majority claims renders the Watch function transformative.

I recognize, of course, that there appears to be no discussion of these services in the record. This is at least partially attributable to the fact that the advent of some of these services post-date this litigation. But this demonstrates handily the point that technology is rapidly evolving, which is all the more reason to decline to pronounce a piece of technology transformative when it is not necessary to do so.

3

## II

In view of the majority's expression of its opinion that the Watch function is "somewhat transformative," I feel compelled to express my own doubts regarding that conclusion.

**1.** The majority's opinion begins its analysis by observing, correctly in my view, that "[i]t is useful to analyze separately distinct functions of the secondary use (i.e., the use by TVEyes of Fox's copyrighted material), considering whether each independent function is a fair use."[13] It then turns to the distinction between the Search function and the Watch function. The Search function "allows clients to *identify* videos that contain keywords of interest"[14] – it "enables users to isolate, from an ocean of programming, material that is responsive to their interests."[15] The Watch function, in contrast, "allows TVEyes clients to *view* up to ten-minute, unaltered video clips of copyrighted content."[16] In short, the Search function, which is not challenged here, is simply a vehicle that locates Fox's copyrighted works among other works of interest – it finds the desired species of fish in the majority's metaphorical sea. But the Watch function then catches those fish and delivers them to the fishmonger's stall where TVEyes lays them unchanged (one might say untransformed) on cracked ice for the inspection of its patrons.

Metaphor aside, the majority then proceeds to "test the Watch function, considering each of the four [fair use] factors."[17] It describes our decision in *Google Books*,[18] noting that we there "held that the 'snippet view' of unaltered, copyrighted text 'add[ed] important value to the basic transformative search function' by allowing users to verify that the list of books returned by the database was

---

[13] Op. at 13:9-11. *See also Craft v. Kobler,* 667 F. Supp. 120, 128 (S.D.N.Y. 1987) (Leval, J.) ("In assessing claims of fair use, we must consider the number, size and importance of appropriated passages, *as well as their individual justifications.*" (emphasis added)); 4 WILLIAM N. PATRY, PATRY ON COPYRIGHT § 10.13, at 10-47 to 10-49 (2012).

[14] Op. at 13:13-14 (emphasis in original).

[15] *Id.* at 16:7-9.

[16] *Id.* at 13:14-15 (emphasis in original).

[17] *Id.* at 14:4-5.

[18] *Authors Guild v. Google, Inc.,* 804 F.3d 202 (2d Cir. 2015) (hereinafter "*Google Books*").

4

responsive to the user's search."[19]  And it then goes on to say:

> "TVEyes's copying of Fox's content *for use in the Watch function* is similarly transformative insofar as it enables users to isolate, from an ocean of programming, material that is responsive to their interests and needs, and to access that material with targeted precision.  It enables nearly instant access to a subset of material–and to information about the material–that would otherwise be irretrievable, or else retrievable only through prohibitively inconvenient or inefficient means."[20]

But, as the majority itself wrote earlier, it is the Search function that enables users to identify the desired fish in the ocean, not the Watch function.  What the Watch function does is to enable instant access to digital recordings of Fox's content that have been identified by the Search function.  And the majority's justification for concluding that the Watch function is "somewhat transformative" is that it "improve[s] the efficiency of delivering content."[21]

**2.**     I am inclined to reject the idea that enhancing the efficiency with which copies of copyrighted material are delivered to secondary issuers, in the context in which the Watch function does so, is transformative.

The concept of transformation is a relatively recent addition to copyright jurisprudence, but its antecedents have been around for a long time.

In 1841, Justice Story said that "no one can doubt that a reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism," but use that "supersede[s] the original work" is not fair.[22]  Building on that idea, Judge Leval's landmark article, which later was adopted substantially by the Supreme Court in the *Pretty Woman* case,[23] said:

> "I believe the answer to the question of justification turns primarily on whether, and to what extent, the challenged use is *transformative.*  The use must be productive and must employ the quoted matter in a different manner or for a different purpose from the original.  A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test; in Justice Story's words, it would merely 'supersede the objects' of the original.  If on the

---

[19]     Op. at 16:1-4.

[20]     *Id.* at 16:7-13 (emphasis added).

[21]     *Id.* at 16:14-17:14.

[22]     *Folsom v. Marsh,* 9 F. Cas. 342, 344 (No. 4,901).

[23]     *Campbell,* 510 U.S. at 578-79.

5

other hand, the secondary use adds value to the original – if the quoted matters is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society.

Transformative uses may include criticizing the quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in the original in order to defend or rebut it. They may also include parody, symbolism, aesthetic declarations, and innumerable other uses."[24]

Even on the majority's view that TVEyes' Watch function substantially improves the efficiency with which TVEyes customers can access Fox copyrighted broadcasts of possible interest, it does no more than repackage and deliver the original works. It adds no new information, no new aesthetics, and no new insights or understandings. I therefore doubt that it is transformative. Indeed, I regard *Infinity Broadcast Corp. v. Kirkwood* as having settled the question whether a use is transformative simply because it is more efficient or convenient than what preceded it.[25]

In that case, the defendant, Kirkwood, offered a service through which a Kirkwood customer, regardless of its physical location, could dial a Kirkwood device over a phone line, tune to the radio station of its choice in any of the nation's 10 largest radio markets, and listen to the broadcast of its chosen station. Kirkwood marketed the service to "radio stations, advertisers, talent scouts, and others" for purposes such as "auditioning on-air talent, verifying the broadcast of commercials, and listing to a station's programming format and feel."[26] No doubt Kirkwood's service was convenient and efficiency-enhancing. It enabled interested clients who, by reason of distance, could not receive the radio stations of interest to them to (a) access those stations through Kirkwood, (b) listen to their broadcasts over telephone lines and (c) do so for reasons that, at least in many cases, had nothing to do with the purposes for which local listeners tuned their radios to their stations of choice. Nevertheless, this Court rejected Kirkwood's fair use defense, stating that there was a "total absence of transformativeness" in Kirkwood's retransmission of the broadcasts.[27] And the Watch function at issue here is essentially indistinguishable in principle.

---

[24]

Pierre N. Leval, *Toward a Standard of Fair Use*, 103 HARV. L. REV. 1105, 1111 (1990).

[25]

150 F.3d 104 (2d Cir. 1998).

[26]

*Id.* at 106 (internal quotation marks omitted).

[27]

*Id.* at 109.

We rejected the argument that convenience of accessing copyrighted material is a transformative purpose in *American Geophysical Union, et al. v. Texaco*[28] as well. That involved photocopying of scientific journal articles for use in laboratories. Texaco there argued that "its conversion of the individual [journal] articles through photocopying into a form more easily used in a laboratory might constitute transformative use."[29] Notwithstanding the fact that the photocopies often were more convenient or efficient than, for example, buying, borrowing, shelving and carrying about bound volumes of journals, we wrote that "Texaco's photocopying merely transforms the material object embodying the intangible article that is the copyrighted original work. Texaco's making of copies cannot properly be regarded as a transformative use of the copyrighted material."[30]

Also closely aligned with this case are others that dealt with technologies relating to digitized music, mp3s, and music sharing. Defendants in those cases argued that their technologies should be considered fair use because they permitted "space-shifting"– they allowed users to store music in different, more convenient forms that allowed them to listen to it in venues more desirable to them.[31] In other words, the technology enhanced efficiency and convenience. But courts presented with this argument either rejected the idea that space-shifting is a transformative purpose or considered the space-shifting argument relevant only to the question of the commercial nature of the use.[32]

---

[28] 60 F.3d 913 (2d Cir. 1994).

[29] *Id.*

[30] *Id.* at 923 (citations omitted).

[31] *See A&M Records, Inc. v. Napster, Inc.* 239 F.3d 1004, 1019 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom. A&M Records, Inc. v. Napster, Inc.,* 284 F.3d 1091 (9th Cir. 2002).

[32] *See A&M Records, Inc.,* 239 F.3d at 1019 (cases holding space-shifting or time-shifting to be fair use inapposite "because the methods of shifting in [those] cases did not also simultaneously involve distribution of the copyrighted material to the general public"); *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.,* 180 F.3d 1072, 1079 (9th Cir. 1999) ("The [device at issue] merely makes copies in order to render portable, or 'space-shift,' those files that already reside on a user's hard drive. Such copying is paradigmatic noncommercial personal use entirely consistent with the purposes of the Act." (citation omitted)); *UMG*

These cases support my inclination to conclude that a technological means that delivers copies of copyrighted material to a secondary user more quickly, efficiently or conveniently does not render the distribution of those copies transformative, at least standing alone.

Nor does *Google Books* support the conclusion that efficiency-enhancing delivery technology is transformative in the circumstances of this case. *Google Books*, like this case, involved two features: a searchable database and the display of "snippets" from the books containing the search term.[33] We held that copying the books to enable the search function had the transformative purpose of "identifying books of interest to the searcher." That purpose was different than the purpose of the books themselves, which served to convey their content to the reader, and it constituted fair use.[34] We held also that the snippets – "horizontal segment[s] comprising ordinarily an eighth of a page" – "add[ed] importantly to the highly transformative purpose of identifying books of interest to the searcher."[35] But *Google Books* does not resolve this case.

Google designed the snippet feature "in a manner that substantially protects against its serving as an effectively competing substitute for Plaintiffs' books," employing safeguards such as "blacklisting" (making permanently unavailable for snippet view one snippet per page and one complete page out of every ten) and showing no snippets at all from the sorts of books for which a short snippet would represent all the content a searcher wanted to see (such as dictionaries and cookbooks).[36] Here, on the other hand, the Watch function shows ten minute clips, and parties can play unlimited numbers of ten minute clips. Certainly a ten minute clip in many, perhaps most, situations suffices for a user to view an entire news segment. And in situations in which that is not the case, the parties dispute the effectiveness of a preventive measure TVEyes introduced during

---

*Recordings, Inc. v. MP3.Com, Inc.,* 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000) (considering the argument that space-shifting is transformative to be "simply another way of saying that the unauthorized copies are being retransmitted in another medium—an insufficient basis for any legitimate claim of transformation").

[33] 804 F.3d at 206.

[34] *Id.* at 217-18.

[35] *Id.* at 209, 218.

[36] *Id.* at 222-23.

8

the course of this litigation to stop users from watching consecutive clips.[37] Given the posture of this case – review of a summary judgment decision adverse to Fox on this point – we must view the facts presented by Fox as true and therefore base our decision on the premise that users may access all of Fox's content by stringing clips together.[38]

The facts here thus differ from *Google Books* quite substantially. The snippet function considered there delivered much less copyrighted content than the Watch function at issue here. Nevertheless, we there concluded that the snippet function only "adds" to the transformative purpose of the Search function. Our conclusion with respect to the Google Books snippet feature therefore does not control the proper characterization of the Watch function at issue here. Moreover, we cautioned in *Google Books* that the case "test[ed] the boundaries of fair use."[39]

**3.** Nor am I persuaded by the majority's reliance on *Sony Corporation of America v. Universal City Studios, Inc.*[40]

---

[37]

Op. at 10:13-16.

[38]

Fair use is an affirmative defense to Fox's infringement claim and thus a matter as to which TVEyes bears the burden of proof. Accordingly, in resisting a determination that TVEyes is entitled to judgment on the basis of fair use, Fox is entitled to the view of the evidence most favorable to it with respect TVEyes' contention that the Watch function is transformative, as it is on all other aspects of that defense. *FDIC v. Giammettei,* 34 F.3d 51, 54 (2d Cir. 1994) ("whatever evidence *there is* to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant") (emphasis in original); *Frankel v. ICD Holdings, S.A.,* 930 F. Supp. 54, 64-65 (S.D.N.Y. 1996) ("one who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense").

[39]

*Google Books*, 804 F.3d at 206.

[40]

464 U.S. 417 (1984).

9

*Sony* considered a claim that the manufacturer of Betamax video recorders was liable for contributory copyright infringement because its sale of the recorders facilitated copyright infringement by consumers by virtue of the consumers' recording of copyrighted broadcasts to enable them to view the programs at times more convenient to them.[41] The Court rejected the contributory infringement claim, essentially on the bases that (a) substantial numbers of copyright holders would not object to the consumers' use of the Sony equipment for "time shifting," and (b) the plaintiffs had failed to prove any likelihood of consequent economic harm.[42]

The majority here reads *Sony* as reasoning "that a secondary use may be a fair use if it utilizes transformative technology to improve the efficiency of delivering content."[43] But *Sony* was decided before Judge Leval's article introduced the concept of transformative use or purpose into the copyright lexicon."[44] I thus find what *Sony* teaches about transformative purpose, if anything, to be less than perfectly clear. I certainly do not find within *Sony* the idea that efficiency-enhancing technology is transformative.

The efficiency enhancement at issue in *Sony* was "time-shifting" – the use by a consumer of a Betamax device to record a broadcast so that the consumer could watch that show at a later, presumably more convenient, time.[45] The Court asked whether time-shifting was a substantial noninfringing use; the answer to that question determined whether Sony could be liable for contributory infringement.[46] It was in that context that the Court found that unauthorized time shifting – consumers recording copyrighted shows without authorization to watch the shows once at a later time – was "not necessarily infringing."[47]

The Court's discussion of time-shifting focused on the non-commercial nature of in-home recording: "[R]espondents failed to demonstrate that time-shifting would cause any likelihood of nonminimal harm to the potential market for, or the value of, their copyrighted works. The Betamax is, therefore, capable of substantial

---

[41]

*Id.* at 419.

[42]

*Id.* at 456.

[43]

Op. at 17:1-3.

[44]

Op. at 17:1-3.

[45]

*Sony*, 464 U.S. at 423.

[46]

*Id.* at 442.

[47]

*Id.* at 447.

noninfringing uses. Sony's sale of such equipment to the general public does not constitute contributory infringement of respondent's copyrights."[48]

Perhaps the Court in *Sony* would have found efficiency-enhancing technology to be transformative for that reason alone had that argument been put to it. But I see no indication of that in the opinion. Rather, *Sony* turned on the question whether "time-shifting," on the facts presented in that case, was a commercial use that affected the broadcasters' ability to make a profit in the market. And the Court so concluded without considering, at least explicitly, whether the recordings served a purpose different from the original broadcasts. In fact, the Court said that "timeshifting merely enables a viewer to see such a work which he had been invited to witness."[49] In other words, time-shifting allows a user to do exactly that which the user could have done with the original: watch the show for whatever entertainment, informational or other purpose it serves. No new purpose had been added. So I hesitate to conclude that *Sony* mandates, or even suggests, the idea that efficiency-enhancing technology is transformative.

My hesitation in this regard is strengthened by this Court's subsequent treatment of *Sony*. No prior opinion of this Court says, or even suggests, that *Sony* stands for the proposition that time-shifting in particular, or efficiency-enhancing delivery technology in general, is transformative. In *Swatch Group Management Services Ltd v. Bloomberg L.P.*, we described *Sony* as a decision "finding a *non-transformative* use to be a fair use."[50] *Infinity Broadcast Corp.* described *Sony*'s discussion of time-shifting as a "determin[ation] that time-shifting of television programs by consumers in their homes was a non-commercial use."[51] Indeed, as noted, we there held that an efficiency promoting technology was not transformative and gave no sign that *Sony* was relevant to that conclusion.

Similarly, *Authors Guild, Inc. v. HathiTrust*[52] and *Google Books*[53] cite *Sony* for various principles, but never for the proposition that efficiency-enhancing technology is transformative, despite that idea's obvious potential application in those cases. Because *HathiTrust* and *Google Books* so clearly confront an issue closely related to that here, I see as instructive their omission of the idea that *Sony* declared efficiency-enhancing delivery technology to be transformative. I would join those

---

[48]

*Id.* at 455.

[49]

*Id.* at 449.

[50]

756 F.3d 73, 84 (2d Cir. 2014) (emphasis added).

[51]

150 F.3d at 109 n.3.

[52]

755 F.3d 87 (2d Cir. 2014).

[53]

804 F.3d at 202.

11

cases in declining to construe *Sony* as offering significant guidance regarding transformative use.

In sum, *Sony*'s relevance to transformative use is, at best, unclear. I decline to join in the majority's novel interpretation of *Sony.*

*III*

For the foregoing reasons, I concur in the judgment of this Court and in part I, the preamble to part II, and parts II.B, III and IV of the majority opinion. I decline to join in part II.A and its characterization of the Watch function as "somewhat transformative."